Susan Elaine BOSTIC, Individually and as Personal Representative of the Heirs and Estate of Timothy Shawn Bostic, Deceased; Helen Donnahoe; and Kyle Anthony Bostic, Petitioners,

v.

GEORGIA–PACIFIC CORPORATION, Respondent.

No. 10–0775.

Supreme Court of Texas.

July 11, 2014.

Donald D. Evans, Eric G. Lasker, Richard O. Faulk, Hollingsworth LLP, Thomas J. Graves, Washington, DC, for Amicus Curiae American Coatings Association, Inc.

Manuel Lopez, Shook Hardy & Bacon L.L.P., Houston, TX, for Amicus Curiae Coalition for Litigation Justice, Inc.

Richard Barrett Phillips Jr., Thompson & Knight LLP, Dallas, TX, Stuart A. Raphael, Hunton & Williams, McLean, VA, for Amicus Curiae Honeywell International, Inc.

Kay Andrews, Hawkins Parnell Thackston & Young LLP, Austin, TX, for Amicus Curiae Kelly–Moore Paint Company, Inc.

Deborah J. La Fetra, J. David Breemer, Pacific Legal Foundation, Sacramento, CA, for Amicus Curiae Pacific Legal Foundation.

James M. Beck, Reed Smith, LLP, Philadelphia, PA, Ruth G. Malinas, Plunkett & Griesenbeck, Inc., San Antonio, TX, for Amicus Curiae Product Liability Advisory Council, Inc.

George S. Christian, Texas Civil Justice League, Austin, TX, for Amicus Curiae Texas Civil Justice League.

Macey Reasoner Stokes, Baker Botts LLP, Sharla J. Frost, Wilson Elser Moskowitz Edelman & Dicker LLP, Houston, TX, for Amicus Curiae Union Carbide Corporation.

Karen K. Maston, Johnson Spalding Doyle West & Trent, Houston, TX, for Other interested party Amtek, Inc.

Nancy Bell Scales, Jones Gill, Houston, TX, for Other interested party Anchor Hocking, Inc.

Clay M. White, White–Shaver, Tyler, TX, for Other interested party Aqua–Chem Congoleum Corp.

Robert Mark Willingham, Willingham Fultz & Cougill LLP, Houston, TX, for Other interested party Asten Johnson, Inc.

Gary D. Elliston, Jennifer Judin, DeHay & Elliston LLP, Paul Edward Hamilton, Law Office Of Paul E Hamilton PLLC, Dallas, TX, for Other interested party Babcock Borsig Power, Inc.

Raul Calderon, Attorney at Law, Austin, TX, for Other interested party Champlain Cable Co.

Charles Josef Blanchard, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX, for Other interested party Crane Co.

Robert E. Thackston, Hawkins Parnell Thackston & Young LLP, Austin, TX, for Other interested party Daimler Chrysler Corp.

Dawn Marie Wright, Thompson & Knight, Tammy Holt Cole, Rose Walker, L.L.P., Dallas, TX, for Other interested party Ford Motor Co.

James R. Old Jr., Germer & Gertz, LLP, Beaumont, TX, for Other interested party Foster Wheeler.

Laurel A. Fay, Schachter Harris LLP, Irving, TX, for Other interested party Garlock Sealing Technologies, LLC.

Raymond P. 'Ray' Harris Jr., Schachter Harris LLP, Irving, TX, for Other interested party Garlock, Inc.

W. Neil Rambin, Sedgwick, LLP, Dallas, TX, for Other interested party General Refractories.

Robert W. Wilkinson, Dogan & Wilkinson, Pascagoula, MS, for Other interested party Guard–Line, Inc.

J. Frank Kinsel Jr., Cantey & Hanger LLP, Fort Worth, TX, for Other interested party Henry Vogt Machine Co.

Kyle C. Steele, Laura A. Frase, Forman Perry Watkins Krutz & Tardy, Dallas, TX, for Other interested party Ingersoll–Rand Co.

Jeffrey Luke Larson, Jill McCarthy Arntz, Kasowitz Benson Torres & Friedman LLP, Houston, TX, for Other interested party Maremont Corp.

Jack Thomas Jamison, Godwin Ronquillo, PC, Dallas, TX, for Other interested party Mid–Valley, Inc.

Joseph Blizzard, Andrews Kurth LLP, Dallas, TX, for Other interested party Rapid American Corp.

Charla G. Aldous, Aldous Law Firm, Christopher J. Panatier, Simon, Eddins & Greenstone, L.L.P., Denyse Ronan Clancy, Eric Asher Policastro, John Lacoste Langdoc, Michael Shane Mills, Christine Tamer, Baron & Budd, P.C., Dallas, TX, for Petitioners.

Deborah G. Hankinson, Rick Thompson, Hankinson LLP, Katherine Mary Warne Ross, Hankinson Levinger LLP, James Bachman Greer, Kane Russell Coleman & Logan, P.C., Melvin David Bailey, Bailey Crowe & Kugler, LLP, Dallas, TX, for Respondent.

Justice WILLETT delivered the opinion of the Court, in which Chief Justice HECHT, Justice GREEN, Justice JOHNSON, and Justice BROWN joined, and in all but Parts II.A.3 and II.B of which Justice GUZMAN joined.

1. 232 S.W.3d 765 (Tex.2007).

DON R. WILLETT, Justice.

In *Borg–Warner Corp. v. Flores*,[1] we addressed standards imposed by Texas law for establishing causation in asbestos-disease cases. *Flores* concerned a plaintiff suffering from asbestosis. In today's case, the plaintiffs sued for damages resulting from the suffering and death of a family member, Timothy Bostic (Bostic), who succumbed to mesothelioma. We hold that the standard of substantial factor causation recognized in *Flores* applies to mesothelioma cases, and write on the meaning of substantial factor causation in this context. We further hold that the plaintiffs were not required to prove that but for Bostic's exposure to Defendant Georgia–Pacific Corporation's asbestos-containing joint compound, Bostic would not have contracted mesothelioma. In this regard, we disagree with language in the court of appeals' decision. However, we agree with that court that the plaintiffs failed to offer legally sufficient evidence of causation, and accordingly affirm the court of appeals' judgment.

## I. Background

In 2002 Bostic was diagnosed with mesothelioma. He was 40 years old, and died of the disease in 2003. Mesothelioma is a rare cancer of a lining of the body's internal organs. There is no dispute that asbestos, when breathed into the lungs, can cause mesothelioma. Bostic's relatives, individually and on behalf of Bostic's estate (Plaintiffs), sued Georgia–Pacific and 39 other defendants, alleging that the defendants' products exposed Bostic to asbestos and caused his disease. Plaintiffs alleged causes of action for negligence and products liability. Plaintiffs claimed that as a

child and teenager Bostic had been exposed to asbestos while using Georgia–Pacific drywall joint compound.

The case went to trial in 2006. The jury found Georgia–Pacific liable under negligence and marketing defect theories, and was asked to allocate causation among numerous entities. The jury assessed 25% of the causation to Knox Glass Company, a former employer who had settled with Bostic, and 75% to Georgia–Pacific.

The trial court signed an amended judgment awarding Plaintiffs approximately $6.8 million in compensatory damages and approximately $4.8 million in punitive damages. The court of appeals concluded that the evidence of causation was legally insufficient and rendered a take-nothing judgment.[2]

## II. Discussion

### A. Proof of Causation in Mesothelioma Cases

The Plaintiffs contend the court of appeals erred in holding that the causation evidence was legally insufficient. In conducting a legal sufficiency review, the final test "must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[3] "We must view the evidence in the light most favorable to the verdict and 'must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'"[4]

### 1. *Flores*

*Flores* concerned proof of causation in a case where Flores, a brake mechanic, allegedly suffering from asbestosis, sued Borg–Warner, a brake pad manufacturer. The jury found that Flores suffered from asbestos-related disease and apportioned to Borg–Warner 37% of the causation.[5] We concluded that the causation evidence was legally insufficient.[6] We held, consistent with section 431 of the Restatement Second of Torts, that to establish causation in fact the plaintiff must prove that the defendant's product was a substantial factor in causing the disease, and that mere proof that the plaintiff was exposed to "some" respirable fibers traceable to the defendant was insufficient.[7] "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred."[8] We held the evidence legally insufficient because the record revealed "nothing about how much asbestos Flores might have inhaled."[9] We held that "while some respirable fibers may be released upon grinding some brake pads, the sparse record here contains no evidence of the approximate quantum of Borg–Warner fibers to which Flores was exposed, and whether

2. 320 S.W.3d 588, 590, 602.

3. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex.2010) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005)).

4. *Id.* (footnote omitted) (quoting *City of Keller*, 168 S.W.3d at 827).

5. *Flores*, 232 S.W.3d at 768.

6. *Id.* at 774.

7. *Id.* at 766, 770.

8. *Id.* at 770 (quoting Restatement (Second) of Torts § 431 cmt. a (1965)).

9. *Id.* at 771.

this sufficiently contributed to the aggregate dose of asbestos Flores inhaled, such that it could be considered a substantial factor in causing his asbestosis." [10]

On further analysis, we held that "proof of mere frequency, regularity, and proximity is necessary but not sufficient, as it provides none of the quantitative information necessary to support causation under Texas law." [11] While the plaintiff was not required to establish causation with "mathematical precision," we required "[d]efendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease." [12] In rejecting a standard that "some" exposure would suffice, the Court recognized: "As one commentator notes, '[i]t is not adequate to simply establish that 'some' exposure occurred. Because most chemically induced adverse health effects clearly demonstrate 'thresholds,' there must be reasonable evidence that the exposure was of sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred." [13]

Plaintiffs urge that the standards established in Flores are not fully applicable because today's case is a mesothelioma case and Flores was an asbestosis case. They contend that a key factual distinction between the two diseases is that relatively minute quantities of asbestos can result in mesothelioma. In Flores, we noted that the development of asbestosis requires a heavy exposure to asbestos, while mesothelioma may result from low levels of exposure. [14] Plaintiffs presented evidence of this same distinction. [15]

■ While Flores left open the prospect of treating asbestosis and mesothelioma cases differently, we decline to do so. We believe the Flores framework for reviewing the legal sufficiency of causation evidence lends itself to both types of cases. In particular, we hold that even in mesothelioma cases proof of "some exposure" or "any exposure" alone will not suffice to establish causation. While the experts in this case testified that small amounts of asbestos exposure can result in mesothelioma, that fact alone does not merit a different analysis. With both asbestosis and mesothelioma, the likelihood of contracting the disease increases with the dose. As to asbestosis, we noted in Flores that this disease "appears to be dose-related, so that the more one is exposed, the more likely the disease is to occur, and the higher the exposure the more severe the disease is likely to be." [16] As to asbestos-related cancer, in Flores we discussed the California Supreme Court's decision in *Rutherford v. Owens–Illinois, Inc.* [17] That case described how expert testimony was presented from both sides establishing "that the plaintiffs' asbestos-related dis-

**10.** *Id.* at 772.

**11.** *Id.*

**12.** *Id.* at 773.

**13.** *Id.*

**14.** *Id.* at 771.

**15.** For example, one of Plaintiffs' experts, Dr. Brody, testified that "there's no safe level for mesothelioma. In other words, no one's ever

been able to show a level that will prevent everyone from getting mesothelioma. Now, you can do that for asbestosis, and you can get pretty close probably for most lung cancer cases, but for mesothelioma, no one's ever shown a safe level."

**16.** 232 S.W.3d at 771 (internal quotation marks omitted).

**17.** 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997), *discussed in Flores,* 232 S.W.3d at 772–73.

ease was 'doserelated'—i.e., that the risk of developing asbestos-related cancer increased as the total occupational dose of inhaled asbestos fibers increased."[18] And in today's case, Plaintiffs' experts consistently testified that all asbestos-related diseases are dose-related.[19] Plaintiffs' experts Brody, Lemen, and Hammar relied in part on the "Helsinki Conference" report,[20] a report stating that "[m]esothelioma can occur in cases with low asbestos exposure. However, very low background environmental exposures carry only an extremely low risk."

If any exposure at all were sufficient to cause mesothelioma, everyone would suffer from it or at least be at risk of contracting the disease. In *Flores* we noted that one of the plaintiff's experts acknowledged that "everyone is exposed to asbestos in the ambient air" and that "it's very plentiful in the environment, if you're a typical urban dweller."[21] In today's case, one of Plaintiffs' experts, Dr. Brody, confirmed that "[w]e all have some asbestos" in our lungs.

He then explained that background levels are sufficiently low that they do not cause disease,[22] and that "multiples of fibers many times over" were required to cause mesothelioma.[23] Acceptance of an any exposure theory would contradict the testimony of plaintiffs' own expert, ignore the importance of dose in determining a causative link, and impose liability even where, for all the jury can tell, the plaintiff might have become ill from his exposure to background levels of asbestos or for some other reason.[24]

More fundamentally, if we were to adopt a less demanding standard for mesothelioma cases and accept that any exposure to asbestos is sufficient to establish liability, the result essentially would be not just strict liability but absolute liability against any company whose asbestos-containing product crossed paths with the plaintiff throughout his entire lifetime. However, "[w]e have recognized that '[e]xposure to asbestos, a known carcinogen, is never healthy but fortunately does not always

**18.** *Rutherford,* 67 Cal.Rptr.2d 16, 941 P.2d at 1209.

**19.** *See infra* note 96.

**20.** *See infra* notes 99–100 an accompanying text.

**21.** 232 S.W.3d at 767.

**22.** Brody testified:
Well, so when we're talking about background, we're talking about what we all have. And it's just a fact of modern society as materials that contain asbestos break down or if you live in an area where there's naturally occurring asbestos, that asbestos will accumulate in the lung to some level, which does not produce disease. That's not a level that anyone can measure disease.

**23.** Brody testified:
Q: Can one fiber of chrysotile [asbestos] or one fiber of amosite [asbestos] cause mesothelioma? A: No.

Q: Okay, Do you have to have more than one?
A: Yeah, of course. I mean a single fiber can cause a genetic error, but I told you that that's not enough to cause disease.
Q: Okay. You have to have more than one, some number greater than one to actually cause these mutations that actually ... cause the uncontrolled cell growth that you talked about?
A: Oh, yes, you have to have many—
Q: Okay.
A:—multiples of fibers many times over to get those kinds of changes.

**24.** *See Baker v. Chevron USA, Inc.,* 680 F.Supp.2d 865, 878 n. 9 (S.D.Ohio 2010) ("[S]ince benzene is ubiquitous, causation under the one-hit theory could not be established because it would be just as likely that ambient benzene was the cause of Plaintiffs' illnesses."), *aff'd,* 533 F. App'x 509 (6th Cir. 2013).

result in disease.' " [25] And we have never embraced the concept of industry-wide liability on grounds that proof of causation might be difficult. Instead, we have rejected such thinking and held firm to the principle that liability in tort must be based on proof of causation by a preponderance of the evidence. In a mesothelioma case, we rejected theories of collective liability—alternative liability, concert of action, enterprise liability, and market share liability—and held instead: "A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product that caused the injury." [26] *Merrell Dow Pharmaceuticals, Inc. v. Havner*, another toxic tort case, further explains:

> Others have argued that liability should not be allocated only on the basis of reliable proof of fault because legal rules should have the goals of "risk spreading, deterrence, allocating costs to the cheapest cost-avoider, and encouraging socially favored activities," and because "consumers of American justice want people compensated." It has been contended that "[f]or some cases that very well may mean creating a compensatory mechanism even in the absence of clear scientific proof of cause and effect".... We expressly reject these views. Our legal system requires that claimants prove their cases by a preponderance of

the evidence.... As Judge Posner has said, "[l]aw lags science; it does not lead it." [27]

If an "any exposure" theory of liability is accepted for mesothelioma cases because science has been unable to establish a dose below which the risk of disease disappears, the same theory would arguably apply to *all* carcinogens. Dr. Lemen, Plaintiffs' epidemiologist and a former Assistant Surgeon General, testified that for all carcinogens the threshold at which the risk falls to zero is unknown.[28]

■ The any exposure theory effectively accepts that a failure of science to determine the maximum safe dose of a toxin necessarily means that every exposure, regardless of amount, is a substantial factor in causing the plaintiff's illness. This approach negates the plaintiff's burden to prove causation by a preponderance of the evidence. As a federal district court reasoned in excluding the testimony of Dr. Hammar, Plaintiffs' expert on specific causation in today's case:

> Rule 702 and *Daubert [v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ] recognize above all else that to be useful to a jury an expert's opinion must be based on sufficient facts and data. The every exposure theory is based on the opposite: a lack of facts and data.... It

**25.** *Flores*, 232 S.W.3d at 770–71.

**26.** *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex.1989).

**27.** 953 S.W.2d 706, 728 (Tex.1997) (citations omitted).

**28.** Lemen testified:
> Q: And isn't it true that this principle that we don't know of any safe level of exposure is true for any carcinogen?
> A: At the present time, we aren't able to identify the carcinogenic compounds, what is safe and what is not safe. And that is

> true pretty much across the board for things that cause cancer.
> Q: So for anything on this list of carcinogens that we'll talk about later, your answer is true that if it is on the list of carcinogens, it's not just asbestos, it's the entire list that you would say we know of no safe level of exposure to it, correct?
> A: Basically that's correct.
> Q: Even if it's used even today day-in and day-out in industrial and consumer products?
> A: That's correct....

seeks to avoid not only the rules of evidence but more importantly the burden of proof.... Dr. Hammar wants to be allowed to tell a jury that all of the plaintiff's *possible* exposures to asbestos during his entire life were contributing causes of the plaintiff's cancer, and, therefore, sufficient to support a finding of legal liability as to the manufacturer of each asbestos containing product, without regard to dosage or how long ago the exposure occurred. Just because we cannot rule anything out does not mean we can rule everything in.[29]

■ Further, there are cases where a plaintiff's exposure to asbestos can be tied to a defendant, but that exposure is minuscule as compared to the exposure resulting from other sources. Proof of any exposure at all from a defendant should not end the inquiry and result in automatic liability. The Restatement Third of Torts provides that "[w]hen an actor's negligent conduct constitutes only a trivial contribution to a causal set that is a factual cause of harm under § 27 [addressing multiple sufficient causes], the harm is not within the scope of the actor's liability."[30] In *Flores* we held the causation evidence legally insufficient because the record revealed "nothing about how much asbestos Flores might have inhaled" but also because Flores did not "introduce evidence regarding what percentage of that indeterminate amount may have originated in Borg–Warner products."[31] And in *Havner* we held that "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with rea-sonable certainty."[32] That statement requires some explication in cases involving multiple exposures to the same toxin, as we discuss below, but here it properly stands for the proposition that, even in mesothelioma cases, liability cannot be imposed on every conceivable defendant whose product exposed the plaintiff to some unquantified amount of asbestos, without proof of something more. "The recent, increasingly strict exposure cases ... reflect a welcome realization by state courts that holding defendants liable for causing asbestos-related disease when their products were responsible for only de minimis exposure to asbestos, and other parties were responsible for far greater exposure, is not just...."[33]

The any exposure theory is also illogical in mesothelioma cases, where a small exposure can result in disease, because it posits that any exposure from a defendant above background levels should impose liability, while the background level of asbestos should be ignored. But the expert testimony in this case was undisputed that the background level varies considerably from location to location. We fail to see how the theory can, as a matter of logic, exclude higher than normal background levels as the cause of the plaintiff's disease, but accept that any exposure from an individual defendant, no matter how small, should be accepted as a cause in fact of the disease. Under the any exposure theory a background dose of 20 does not cause cancer, but a defendant's dose of 2 plus a background dose of 5 does.

---

29. *Smith v. Ford Motor Co.*, 2013 WL 214378, at *2–3 (D.Utah Jan. 18, 2013) (emphasis in original).

30. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 36 (2010).

31. 232 S.W.3d at 771–72.

32. *Havner*, 953 S.W.2d at 720.

33. David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 BROOK. L.REV. 51, 59 (2008).

For these reasons, we extend the reasoning and holdings of *Flores* to mesothelioma cases, including our rejection of the "any exposure" theory of liability, with the clarifications discussed below.

## 2. But For Causation

Plaintiffs complain that the court of appeals erred in requiring them to prove but for causation in addition to substantial factor causation. The term "but for causation" may encompass several meanings. As we attempt to clarify, "but for" and "substantial factor" are overlapping concepts and, to the extent they embody different tests, application of those tests usually lead to the same result. But here we are concerned that the court of appeals' decision might be read to require satisfying a proof requirement that but for Bostic's exposure to Georgia–Pacific's products, he would not have contracted mesothelioma. We agree with Plaintiffs that language in the court of appeals' decision appears to require such proof. The court stated that "[b]oth producing and proximate cause contain the cause-in-fact element, which requires that the defendant's act be a substantial factor in bringing about the injury and without which the harm would not have occurred." [34] It stated, " 'In asbestos cases, then, we must determine whether the asbestos in the defendant's product was a substantial factor in bringing about the plaintiff's injuries,' and without which the injuries would not have occurred." [35] In doing so, the court of appeals quoted from *Flores* but appended but for language to the end of its sentence. The court expressly disagreed with Plaintiffs' assertion that *Flores* did not require proof of but for causation.[36] It then concluded that the testimony of Dr. Hammar was wanting because "he could not opine that Timothy would not have developed mesothelioma absent exposure to Georgia–Pacific asbestos-containing joint compound." [37]

To a point, we agree with Georgia–Pacific that but for causation is a recognized standard for proof of producing cause, also known as causation in fact,[38] applicable to this products liability case.[39] We have often recognized but for causation, alone or in combination with substantial factor causation, as the standard for establishing

---

**34.** 320 S.W.3d at 596 (quoting *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835 (Tex.2009) (internal quotation marks omitted)).

**35.** *Id.* (quoting *Flores*, 232 S.W.3d at 770).

**36.** *Id.* ("[Plaintiffs] assert that *Flores* does not require 'but-for' causation in proving specific causation and that *Flores* requires only that [Plaintiffs] prove Timothy's exposure to Georgia–Pacific asbestos-containing joint compound was a 'substantial factor' in contributing to his risk of mesothelioma. We disagree.").

**37.** *Id.*

**38.** *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex.2010) (recognizing that "the producing cause inquiry is conceptually identical to that of cause in fact").

**39.** Producing cause is the level of causation applicable to products liability cases. *See, e.g., Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Plaintiffs sued under theories of negligence and products liability, the latter being based on a marketing defect theory. However, Plaintiffs concede that but for causation was required under their negligence theory of liability because the jury was instructed that proximate cause, a necessary element of negligence liability, required proof of but for causation. The jury was instructed that proximate cause "means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred." *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex.2000) ("Since neither party objected to this instruction, we are bound to review the evidence in light of this definition.").

causation in fact.[40] Indeed, "to say of a cause of an injury that it is one 'but for which the injury would not have happened' is to repeat something already included in the usual and ordinary meaning of the word 'cause.' "[41]

■ Nor is there anything unusual in our recognizing but for causation as the causation standard in tort cases. The Restatement Second of Torts in section 431 generally recognizes that an "actor's negligent conduct is a legal cause of harm to another if [ ] his conduct is a substantial factor in bringing about the harm."[42] Comment *a* to this section makes clear that, as a general proposition, substantial factor causation incorporates the concept of but for causation: "In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. Except as stated in § 432(2), this is necessary, but it is not of itself sufficient."[43] Hence, the comment indicates that but for causation is generally a component of substantial factor causation.

The Restatement Third of Torts likewise embraces but for causation as the general causation standard in tort cases. Section 26 of the subtitle on Liability for Physical and Emotional Harm provides: "Tortious conduct must be a factual cause of harm for liability to be imposed. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."[44] The Restatement Third not only embraces but for causation, but includes some criticism of the substantial factor

**40.** *E.g., Crump*, 330 S.W.3d at 222–23 ("Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.") (quoting *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 799 (Tex.2004)); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003) ("The test for cause in fact, or 'but for causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.' "); *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995) ("Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred."); *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993) (holding that to establish causation in fact element common to both negligence and products liability causes of action, "plaintiffs must show that but for GM's omission the accident would not have occurred").

**41.** *Tex. Indem. Ins. Co. v. Staggs*, 134 Tex. 318, 134 S.W.2d 1026, 1030 (1940) (quoting *Tex. & Pac. Ry. v. Short*, 62 S.W.2d 995, 999 (Tex.App.-Eastland 1933, writ ref'd)).

**42.** Restatement (Second) of Torts § 431 (1965). This provision addresses negligence liability, and as noted today's case is, for our purposes, a products liability case. *See supra* note 39. However, the element of causation in fact is the same under the two theories of liability. To recover under a negligence theory, the plaintiff must establish proximate causation, while recovery under a products liability theory requires proof of producing causation. Proximate cause and producing cause share the common element of causation in fact, with proximate cause including the additional element of foreseeability. *See Crump*, 330 S.W.3d at 222–23; *Flores*, 232 S.W.3d at 770; *Union Pump*, 898 S.W.2d at 775; *Saenz*, 873 S.W.2d at 356; *see also* Restatement (Third) of Torts: Products Liability § 15 (1998) ("Whether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort."); Restatement (Second) of Torts § 431 cmt. e (1965) ("Although the rules stated in this Section are stated in terms of the actor's negligent conduct, they are equally applicable where the conduct is intended to cause harm, or where it is such as to result in strict liability.").

**43.** Restatement (Second) of Torts § 431 cmt. a (1965).

**44.** Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010).

test.[45]

■ However, we follow *Flores* and conclude that in products liability cases where the plaintiff was exposed to multiple sources of asbestos, substantial factor causation is the appropriate basic standard of causation without including as a separate requirement that the plaintiff meet a strict but for causation test. Due to the nature of the disease process, which can occur over decades and involve multiple sources of exposure, establishing which fibers from which defendant actually caused the disease is not always humanly possible. Even if the exposure from a particular defendant was by itself sufficient to cause the disease, in multiple-exposure cases the plaintiff may find it impossible to show that he would not have become ill but for the exposure from that defendant.

In *Flores* we recognized "the proof difficulties accompanying asbestos claims. The long latency period for asbestos-related diseases, coupled with the inability to trace precisely which fibers caused disease and from whose product they emanated, make this process inexact." [46] Along similar lines, the Virginia Supreme Court recently observed that "if the traditional but-for definition of proximate cause was invoked, the injured party would virtually never be able to recover for damages arising from mesothelioma in the context of multiple exposures. . . ." [47] Further, in *Flores* we quoted from *Rutherford:*

> Plaintiffs cannot be expected to prove the scientifically unknown details of carcinogenesis, or trace the unknowable path of a given asbestos fiber. . . . Instead, we can bridge this gap in the

humanly knowable by holding that plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth.[48]

This language is inconsistent with a strict requirement of proving that but for the particular fibers traceable to the sued defendant, the plaintiff would not have become ill. In *Flores* we keyed on substantial factor causation, and did not require proof of but for causation. The absence of but for language in *Flores* was not inadvertent.

■ Again, our approach did not break new ground. While but for causation is a core concept in tort law, it yields to the more general substantial factor causation in situations where proof of but for causation is not practically possible or such proof otherwise should not be required. A leading treatise has observed that the substantial factor approach "in the great majority of cases . . . produces the same legal conclusion as the but-for test," but "was developed primarily for cases in which application of the but-for rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the

45. *See id.* § 26 cmt. j.

46. 232 S.W.3d at 772.

47. *Ford Motor Co. v. Boomer*, 285 Va. 141, 736 S.E.2d 724, 729 (2013).

48. 67 Cal.Rptr.2d 16, 941 P.2d at 1219 (footnote omitted) (emphasis in original), *quoted in Flores*, 232 S.W.3d at 772–73.

same result."[49] Likewise, *Rutherford* reasoned that "[t]he substantial factor standard generally produces the same results as does the 'but for' rule of causation," but the substantial factor test "has been embraced as a clearer rule of causation—one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact."[50] This problem arises in toxic tort cases such as *Flores, Boomer, Rutherford,* and today's case, where the plaintiff has suffered exposure from multiple sources.

The Restatement Second of Torts likewise recognizes an alternative to strict but for causation in certain cases involving multiple causes of injury. While, as noted, section 431 and its comment *a* generally require but for causation, comment *a* further notes that this rule applies "[e]xcept as stated in § 432(2)." Section 432(2) addresses cases involving multiple causation: "If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about."[51] Section 432(2) recognizes a scenario where the actor's conduct is not, strictly speaking, a but

for cause, because another force would have caused the harm anyway.

Likewise, while the Restatement Third generally embraces but for causation in section 26,[52] as noted above, it elsewhere still recognizes substantial factor causation in some products liability cases[53] and in a sense recognizes the converse of substantial factor causation, by providing in section 36 that "[w]hen an actor's negligent conduct constitutes only a trivial contribution to a causal set that is a factual cause of harm under § 27, the harm is not within the scope of the actor's liability."[54] So while not requiring substantial factor causation in section 26, which sets out the general causation standard, it recognizes in the negative that a trivial contribution to causation will not suffice. This rule hardly represents a sea change, as section 433(a) of the Restatement and Restatement Second have long stated that, in making a substantial factor determination, an important consideration is "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it."[55] Further, while section 26 moves away from the substantial factor standard, comment *j* to that section explains its particular usefulness in certain multiple-causation cases.[56]

**49.** W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41 (5th ed.1984).

**50.** 67 Cal.Rptr.2d 16, 941 P.2d at 1214.

**51.** RESTATEMENT (SECOND) OF TORTS § 432(2) (1965).

**52.** RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 (2010).

**53.** *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 16(a) (1998) ("When a product is defective at the time of commercial sale or other distribution and the defect is a substantial factor in increasing the plaintiff's harm beyond that which would have resulted from

other causes, the product seller is subject to liability for the increased harm.").

**54.** RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 36 (2010).

**55.** RESTATEMENT (SECOND) OF TORTS § 433(A) (1965); RESTATEMENT OF TORTS § 433(a) (1934).

**56.** RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. j (2010) (stating that the "primary function" of the substantial-factor test "was to permit the factfinder to decide that factual cause existed when there were multiple sufficient causes—each of two separate causal chains sufficient to bring about the plaintiff's harm, thereby rendering neither a but-for cause").

Moreover, the Restatement Third, like the earlier Restatements, does not require strict but for causation in a toxic tort multiple-exposure case like today's case. Section 26 generally requires but for causation, by stating that "[c]onduct is a factual cause of harm when the harm would not have occurred absent the conduct." However, section 26 ends by stating that "[t]ortious conduct may also be a factual cause of harm under section 27." Section 27 addresses cases of multiple causation and states: "If multiple acts occur, each of which under § 26 alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm." [57] Read in a vacuum, sections 26 and 27 might appear to require strict but for causation for each defendant in a multiple-exposure case where the exposures did not occur "at the same time," the position we understand Georgia–Pacific to take. These sections are fraught with complexities and what if scenarios, set out in many comments and illustrations. Comment *f* to section 27 states:

> In some cases, tortious conduct by one actor is insufficient, even with other background causes, to cause the plaintiff's harm. Nevertheless, when combined with conduct by other persons, the conduct overdetermines the harm, i.e., is more than sufficient to cause the harm.... The fact that an actor's conduct requires other conduct to be sufficient to cause another's harm does not obviate the applicability of this Section. [58]

And comment *g* posits the scenario closest to our case:

> [T]he situation addressed in Comment *f* has occurred most frequently in cases in which persons have been exposed to multiple doses of a toxic agent. When a person contracts a disease such as cancer, and sues multiple actors claiming that each provided some dose of a toxic substance that caused the disease, the question of the causal role of each defendant's toxic substance arises. Assuming that there is some threshold dose sufficient to cause the disease, the person may have been exposed to doses in excess of the threshold before contracting the disease. Thus, some or all of the person's exposures may not have been but-for causes of the disease. Nevertheless, each of the exposures prior to the person's contracting the disease ... is a factual cause of the person's disease under the rule in this Section. [59]

■ In short, we do not think the Restatements, in their attempts to synthesize many decades of tort law, would require the plaintiffs to meet a strict but for causation test in a case like today's case. More importantly, our controlling decision in *Flores* does not impose this requirement. Accordingly, we hold that Plaintiffs were required to establish substantial factor causation, but were not required to prove that but for Bostic's exposure to Georgia–Pacific's products, he would not have contracted mesothelioma. The court of appeals erred insofar as it stated otherwise.

### 3. Further Analysis, under *Havner*, of Substantial Causation in Asbestos Cases

We write further on the meaning of substantial factor causation in asbestos cases. First, we note that for all the refinements *Flores* places on the substantial causation standard, we also believe that some discretion must be ceded to the trier of fact in determining whether the plaintiff

---

57. *Id.* § 27.

58. *Id.* § 27 cmt. f.

59. *Id.* § 27 cmt. g.

met that standard. One respected treatise has opined that it is "neither possible nor desirable to reduce [substantial factor] to any lower terms." [60]

We recognized a quantitative approach to causation in *Merrell Dow Pharmaceuticals, Inc. v. Havner,*[61] and Georgia–Pacific urges use of that approach in today's case. *Havner* provides useful insights that should be integrated with our analysis here.

In *Havner,* the plaintiffs sued on behalf of a child born with birth defects allegedly caused by a drug, Bendectin, taken by the mother while she was pregnant. The Court held that the expert testimony, which relied in part on epidemiological studies, was legally insufficient to establish causation.[62] We recognized that epidemiological studies showing that the population exposed to a toxin faced more than double the risk of injury facing the unexposed or general population could be used to establish causation.[63]

While recognizing that causation might be established through epidemiological studies showing more than a doubling of the risk, also described as a relative risk of more than 2.0,[64] we recognized that this requirement was not a "litmus test" or "bright-line boundary" and that a single study would not suffice to establish legal causation.[65] We discussed several other indicia of scientific validity. A claimant must show that his circumstances are similar to the group analyzed in the study.[66] We observed that scientific studies also consider the "significance level" or "confidence level," that the generally accepted confidence level is 95%,[67] and that statistical significance also requires a "confidence interval" that does not include the number 1.[68] We noted that "[t]here are many other factors to consider in evaluating the reliability of a scientific study including, but certainly not limited to, the sample size of the study, the power of the study, confounding variables, and whether there was selection bias." [69] We also noted that courts must be "especially skeptical of scientific evidence that has not been published or subjected to peer review," [70] and that "[a] related factor . . . is whether the study was prepared only for litigation." [71]

*Havner* is a foundational part of our jurisprudence. We have never held that it applies universally to all tort cases where causation is an issue.[72] It offers an alter-

---

60. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41 (5th ed.1984); *see also id.* § 41, at n. 30 ("Hart and Honoré . . . object strongly to the phrase as undefinable. So, Green suggests is 'reasonable,' but that does not prevent its use to pose an issue for the jury.").

61. 953 S.W.2d 706 (Tex.1997).

62. *Id.* at 708, 730.

63. *Id.* at 717–18.

64. *See id.* at 718; *see also id.* at 721 ("For the result to indicate a doubling of the risk, the relative risk must be greater than 2.0.").

65. *Id.* at 718–19, 727.

66. *Id.* at 720.

67. *Id.* at 723–24.

68. *Id.* at 723.

69. *Id.* at 724.

70. *Id.* at 727 (internal quotation marks omitted); *see also E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995) (holding that one factor in deciding reliability of expert testimony is "whether the theory has been subjected to peer review and/or publication").

71. *Havner,* 953 S.W.2d at 726.

72. For example, we noted in *Flores* that epidemiological studies discussed in *Havner* "are not necessary to prove causation" though properly designed studies can serve as part of

native method of establishing causation "[i]n the absence of direct, scientifically reliable proof of causation."[73] To some extent *Havner's* discussion of the use of scientific studies addressed whether those studies supported general causation—the issue of whether Bendectin was capable of causing birth defects.[74] Epidemiological studies by their nature address general causation by analyzing a cohort of individuals,[75] rather than specific causation—the jury issue of whether the defendant's product caused the specific injury in issue,[76] but these studies are sometimes used effectively by experts to help establish specific causation, as *Havner* recognized.[77] In today's case, general causation is not an issue. Georgia–Pacific does not dispute, for purposes of this appeal, that exposure to asbestos fibers can cause mesothelioma.[78]

 Despite differences between *Havner* and today's case, *Havner's* focus on proof of more than a doubling of risk, as established by scientifically reliable

studies, is premised on fundamental principles of tort law that have application here. *Havner's* discussion of epidemiological studies was based on the tenet in our law that expert testimony on causation must be scientifically reliable. "If the expert's scientific testimony is not reliable, it is not evidence."[79] We discussed our decision in *E.I. du Pont de Nemours and Co. v. Robinson,*[80] where we analyzed the issue of expert reliability.[81] As recognized in *Robinson,* "In addition to being relevant, the underlying scientific technique or principle must be reliable. Scientific evidence which is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702."[82]

*Havner* also held that, notwithstanding competing policies of deterrence, risk-avoidance, or compensating innocent injured parties, "[o]ur legal system requires

---

the evidence establishing causation. *Flores,* 232 S.W.3d at 772.

stance caused a particular individual's injury.").

**73.** *Havner,* 953 S.W.2d at 715.

**74.** *Id.* ("The Havners rely to a considerable extent on epidemiological studies for proof of general causation."); *see also Merck & Co. v. Garza,* 347 S.W.3d 256, 265 (Tex.2011) ("*Havner* holds ... that when parties attempt to prove general causation using epidemiological evidence, a threshold requirement of reliability is that the evidence demonstrate a statistically significant doubling of the risk.").

**75.** *See Havner,* 953 S.W.2d at 715 ("Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition.").

**76.** *Id.* at 714 ("General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a sub-

**77.** *Id.* at 715.

**78.** Some of the Georgia–Pacific drywall compound to which Bostic was allegedly exposed contained chrysotile asbestos fibers. Plaintiffs' experts testified that the prevailing scientific consensus is that chrysotile fibers can cause mesothelioma. While Georgia–Pacific contends that a scientific debate continues as to whether inhalation of chrysotile fibers causes mesothelioma, it states in its principal brief that it is not challenging "the assumption that exposure to chrysotile can cause mesothelioma."

**79.** *Id.* at 713.

**80.** 923 S.W.2d 549 (Tex.1995).

**81.** *Havner,* 953 S.W.2d at 712, 714.

**82.** *Robinson,* 923 S.W.2d at 557 (citation, internal quotation marks omitted).

that claimants prove their cases by a preponderance of the evidence," and we rejected all rationales for adopting a lesser burden of proof.[83] In concluding that studies showing more than a doubling of the risk may be supportive of legal causation, provided that other indicia of reliability are met, we explained that this standard corresponds to the legal requirement that the plaintiff prove his case by a preponderance of the evidence:

Recognizing that epidemiological studies cannot establish the actual cause of an individual's injury or condition, a difficult question for the courts is how a plaintiff faced with this conundrum can raise a fact issue on causation and meet the "more likely than not" burden of proof.

\* \* \*

Other courts have likewise found that the requirement of a more than 50% probability means that epidemiological evidence must show that the risk of an injury or condition in the exposed population was more than double the risk in the unexposed or control population.

\* \* \*

Although we recognize that there is not a precise fit between science and legal burdens of proof, we are persuaded that properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort case and that there is a rational basis for relating the requirement that there be more than a "doubling of the risk" to our no evidence standard of review and to the more likely than not burden of proof.

Assume that a condition naturally occurs in six out of 1,000 people even when they are not exposed to a certain drug. If studies of people who *did* take the drug show that nine out of 1,000 contracted the disease, it is still more likely than not that causes other than the drug were responsible for any given occurrence of the disease.... However, if more than twelve out of 1,000 who take the drug contract the disease, then it may be *statistically* more likely than not that a given individual's disease was caused by the drug.

This is an oversimplification of statistical evidence relating to general causation ... but it illustrates the thinking behind the doubling of the risk requirement.

\* \* \*

[T]he law must balance the need to compensate those who have been injured by the wrongful actions of another with the concept deeply imbedded in our jurisprudence that a defendant cannot be found liable for an injury unless the preponderance of the evidence supports cause in fact. The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science.[84]

In sum, *Havner* enunciated principles in toxic tort cases that (1) expert testimony of causation must be scientifically reliable, (2) the plaintiff must establish the elements of his claim by a preponderance of the evidence, and (3) where direct evidence of causation is lacking, scientifically reliable evidence in the form of epidemiological studies showing that the defendant's product more than doubled the plaintiff's risk of injury appropriately corresponds to the legal standard of proof by

---

83. 953 S.W.2d at 728.

84. *Id.* at 715–18 (citations omitted) (emphasis in original).

a preponderance of the evidence. These principles should apply to asbestos cases. As to the availability of scientific studies, asbestos-related disease has been researched for many decades and the population of potentially affected persons numbers in the millions. Dr. Lemen, one of Plaintiffs' experts, testified that many millions of people have been exposed to chrysotile asbestos from manmade sources, that a scientific consensus that asbestos causes serious illness has existed since 1930, that a statistically significant link between asbestos and mesothelioma was shown in 1963, and that by 1965 over a thousand publications discussed asbestos disease. We observed over 15 years ago that "[a]sbestos litigation, particularly asbestos products cases, has achieved maturity." [85] We therefore conclude that in the absence of direct proof of causation, establishing causation in fact against a defendant in an asbestos-related disease case requires scientifically reliable proof that the plaintiff's exposure to the defendant's product more than doubled his risk of contracting the disease. A more than doubling of the risk must be shown through reliable expert testimony that is based on epidemiological studies or similarly reliable scientific testimony.

Multiple-exposure cases raise the issues of how the finder of fact should consider exposure from sources other than the defendant, what proof might be required as to those other sources, and who has the burden of proof regarding those other sources. These are difficult questions.

■■■■ We recognized in *Havner*, generally, that "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reason-

able certainty." [86] We think this statement in *Havner* is correct but cannot be applied without qualification to cases involving multiple sources of exposure to the same toxin. We think the plaintiff should be required to establish more than a doubling of the risk attributable to the defendant's product, for the reasons discussed, but do not think it necessary or fair to require a plaintiff to track down every possible source of asbestos exposure and disprove that those other exposures caused the disease. Strict application of *Havner*'s requirement of ruling out all other possible causes of disease would in effect re-introduce a strict but for requirement, which for reasons already discussed is not appropriate in a multiple-exposure case like today's case. Our law accepts that in cases of multiple exposure multiple defendants may be held liable for causing the plaintiff's disease. And in multiple-exposure cases few if any plaintiffs could ever establish which particular fibers from which particular defendant caused the disease, and we do not believe the plaintiff should be required to quantify the exposure from every other conceivable source, occurring perhaps over a period of decades.

■■■■ However, when evidence is introduced of exposure from other defendants or other sources, proof of more than a doubling of the risk may not suffice to establish substantial factor causation. In the Restatement Second of Torts, and as quoted by our Court in *Flores*, substantial factor causation "denote[s] the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility,

**85.** *In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex.1998).

**86.** 953 S.W.2d at 720.

rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred."[87] The law should retain this concept. Along the same lines, the Restatement Third recognizes that a defendant's trivial contribution to multiple causes will not result in liability.[88]

Suppose a plaintiff shows that his exposure to a defendant's product more than doubled his chances of contracting a disease, but the evidence at trial also established that another source of the toxin increased the chances by a factor of 10,000. In this circumstance, a trier of fact or a court reviewing the sufficiency of the evidence should be allowed to conclude that the defendant's product was not a substantial factor in causing the disease.

■ JUSTICE LEHRMANN presents a thorough and thought-provoking dissent, but we cannot agree with its ultimate conclusion that the evidence of causation was legally sufficient in this case. The dissent contends that *Havner* primarily focused on general causation. As noted above, *Havner* was concerned with general causation while today's case is not. But

*Havner* was also concerned with specific causation. General causation is never the ultimate issue of causation tried to the finder of fact in a toxic tort case. The ultimate issue is always specific causation— whether the defendant's product caused the plaintiff's injury. General causation as established through epidemiological studies is relevant only insofar as it informs specific causation. In *Havner*, we held that where direct evidence of specific causation is unavailable, specific causation may be established through an alternative two-step process whereby the plaintiff establishes general causation through reliable studies, and then demonstrates that his circumstances are similar to the subjects of the studies.[89] By meeting these requirements, the plaintiff shows that his exposure to the defendant's product more than doubled his individual risk and thereby establishes specific causation. *Havner* is, therefore, relevant to our analysis today. Its recognition that every plaintiff must prove his case by a preponderance of the evidence has application here.

The dissent suggests that our analysis is flawed because specific causation as ex-

---

87. *Flores*, 232 S.W.3d at 770 (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)).

88. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 36 (2010).

89. *See Havner*, 953 S.W.2d at 715 ("[I]n many toxic tort cases ... there will be no reliable evidence of specific causation. In the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. The finder of fact is asked to infer that because the risk is demonstrably greater in the general population due to exposure to the substance, the claimant's injury was more likely than not caused by that substance. Such a theory ... is based on a policy determination that when the incidence of a disease

or injury is sufficiently elevated due to exposure to a substance, someone who was exposed to that substance and exhibits the disease or injury can raise a fact question on causation."); *id.* at 720 ("To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies."); *see also Merck*, 347 S.W.3d at 265 ("*Havner* holds ... that when parties attempt to prove general causation using epidemiological evidence, a threshold requirement of reliability is that the evidence demonstrate a statistically significant doubling of the risk. In addition, *Havner* requires that a plaintiff show 'that he or she is similar to [the subjects] in the studies....' ").

plicated in *Havner* is different from substantial factor causation. We disagree. "Substantial factor" is a term we use to describe the level of proof required to establish specific causation, which is always an element of the plaintiff's case.

The dissent argues that *Havner* is inapplicable to multiple-exposure cases. We are at a loss to understand why. If exposure from other sources were irrelevant when we decided *Havner*, we would not have stated that other causes of the disease should be excluded,[90] a requirement we actually relax in today's case because of the special difficulties encountered in multiple-exposure cases, as discussed above. But we think *Havner*'s requirement of proof of a more than doubling of the risk is particularly useful in multiple-exposure cases where the alternative is to abdicate resort to scientifically reliable proof and accept that any exposure will suffice.

The dissent also suggests that we would require the application of *Havner* even in cases where the only conceivable source of exposure to a toxin is the defendant. If the plaintiff can establish with reliable expert testimony that (1) his exposure to a particular toxin is the only possible cause of his disease, and (2) the only possible source of that toxin is the defendant's product (or, in another of the dissent's hypotheticals, the products of two defendants whose combined doses established the required threshold dose to cause disease), this proof might amount to direct proof of causation and the alternative approach embraced in *Havner* might be un-

necessary. These hypotheticals certainly do not apply to today's case, as discussed further below. Plaintiffs never claimed that Georgia–Pacific was the only source of Bostic's exposure or that combined exposures from multiple defendants were needed to cause his disease.[91] Plaintiffs tried the case in exactly the opposite manner, by insisting that any exposure to asbestos beyond background exposure should be treated as a cause of Bostic's disease. Further, in the real world of complex environments and complex organisms, we think that science is often limited to establishing probabilities. *Havner*'s recognition that science must sometimes resort to probabilistic approaches is hardly a valid criticism of that decision. We assume the dissent has no quarrel with quantum mechanics. Establishing the direct proof posited in the dissent's hypotheticals might prove far more difficult than the method of proof sanctioned in *Havner*. Excluding the universe of all other possible causes, which we do not require, might prove more daunting than what we do require. And even in a single-exposure case, we think that proof of dose would be required, because as *Flores* noted, "One of toxicology's central tenets is that the dose makes the poison."[92] As explained below, dose was not established in this case.

### 4. Recapitulation

█ We conclude that in all asbestos cases involving multiple sources of exposure, including mesothelioma cases, the standards for proof of causation in fact are

---

90. 953 S.W.2d at 720.

91. On the latter point, the following exchange occurred at oral argument:

Q: [Y]ou argue, as I understand it, that if there hadn't been any other exposure, the exposure to Georgia–Pacific product was enough.

A: Correct, Your Honor, which is what—

Q: So you're not making the argument that even though it wasn't enough, if you add it in with everything else, that would have been enough.

A: No. We are not at all, and I want to be very clear on that....

92. *Flores*, 232 S.W.3d at 770 (internal quotation marks omitted).

the same. In reviewing the legal sufficiency of the evidence:

- proof of "any exposure" to a defendant's product will not suffice and instead the plaintiff must establish the dose of asbestos fibers to which he was exposed by his exposure to the defendant's product;
- the dose must be quantified but need not be established with mathematical precision;
- the plaintiff must establish that the defendant's product was a substantial factor in causing the plaintiff's disease;
- the defendant's product is not a substantial factor in causing the plaintiff's disease if, in light of the evidence of the plaintiff's total exposure to asbestos or other toxins, reasonable persons would not regard the defendant's product as a cause of the disease;
- to establish substantial factor causation in the absence of direct evidence of causation, the plaintiff must prove with scientifically reliable expert testimony that the plaintiff's exposure to the defendant's product more than doubled the plaintiff's risk of contracting the disease.

### B. Proof of Causation in This Case

Georgia–Pacific manufactured and sold asbestos-containing joint compound from 1965 to 1977. Bostic was born in 1962 and turned 15 in 1977. The joint compound was sold in a dry-mix form, to which water was added to make drywall "mud," and a pre-mixed form. The compound was used to smooth cracks and joints during drywall installation and repair. During the 1965–77 period, the compound contained chrysotile asbestos,[93] the most common form of asbestos used commercially. Asbestos fibers can become airborne when dry compound is sanded, mixed, or swept as part of normal drywall work.

Bostic and his father Harold Bostic (Harold) testified by deposition at trial. Bostic's exposure to asbestos-containing Georgia–Pacific products occurred when, as a child and teenager, he assisted Harold in remodeling projects for friends and family. Plaintiffs contend that Bostic's exposure as a child is particularly significant since several experts agreed that children are especially vulnerable to exposure to asbestos and carcinogens in general. Bostic helped his father mix and sand drywall compound from the age of five. Plaintiffs contend that Bostic was also exposed to asbestos from exposure to Harold's clothing. Bostic lived with his father until his parents divorced in 1972, when he was 9, and he stayed with his father thereafter on weekends, holidays, and at times during the summer.

Harold testified that he performed drywall work on various projects during the relevant period. He testified that he used Georgia–Pacific drywall compounds "[l]ike 98% of the time." Bostic assisted Harold on projects during the 1967–77 time frame when Georgia–Pacific drywall compound contained asbestos. Harold testified that he and Bostic used Georgia–Pacific compound "[m]any, many, many times." He was able to recall specifically eight projects during the relevant period, although he thought there were other projects he simply could not recall. Of the specific projects he could recall, he specifically identified one where Georgia–Pacific compound was used, a job where he constructed a kit house for a friend. He could not

---

**93.** As noted above, *see supra* note 78, Georgia–Pacific does not dispute for purposes of this appeal that exposure to chrysotile asbestos fibers can cause mesothelioma. "Chrysotile asbestos is the most abundant type of asbestos fiber and is a serpentine fiber consisting of 'pliable curly fibrils which resemble scrolled tubes.'" *Flores*, 232 S.W.3d at 766 n. 4.

recall whether Bostic was present when drywall work was done on this project. Bostic could not recall with certainty ever using Georgia–Pacific drywall products during the relevant 1967–77 period.

Bostic was exposed to asbestos from Knox Glass Company. Harold was employed at Knox Glass from 1962 until 1984. Bostic lived with his father until his parents divorced and sometimes stayed with his father after 1972 as noted above. He also lived with his father from ages 15 to 18. Bostic worked at Knox Glass in the summers of 1980, 1981, and 1982. While Plaintiffs point to Bostic's testimony that he spent only about three months during these summers in the "hot end" of the plant where asbestos was prevalent, he testified that he frequently worked 16 hours a day as "a relief hot end worker." Asbestos was used in products extensively at the plant, in cements, fireproofing, asbestos cloth, pumps, packing, valves, furnaces, and other products. Bostic's work included cutting asbestos cloth, cleaning up after asbestos pipe insulation was repaired, removing and replacing asbestos from machines, and wearing asbestos gloves. One of his main jobs was cutting asbestos cloth. He had no respiratory protection. He was exposed to asbestos from the Knox Glass plant due to his own employment and also from exposure to asbestos brought home on his father's clothes. Bostic and Harold participated in a study finding that 27% of workers at the plant had developed asbestos-related illnesses, although the duration of Bostic's employment at the plant was at the low end of the employees studied.

Bostic was exposed to asbestos while employed by another company, Palestine Contractors, in 1977 and 1978, and while working alone and with his father on automobiles with brake pads and other parts that contained asbestos. As an adult Bostic was also exposed to asbestos while doing remodeling work, where he was exposed to shingles, tiles, and other asbestos-containing building materials that were not manufactured by Georgia–Pacific. His primary employment, from 1984 until he stopped working due to his illness at the end of 2002, was as a correctional officer with the Texas Department of Criminal Justice (TDCJ). He did not claim exposure to asbestos from this employment.

Work history sheets provide certain details of Bostic's work history. These were based on information provided by Bostic and reviewed by Plaintiffs' experts. Bostic reported that he had used drywall compounds from seven different manufacturers.

Plaintiffs offered the testimony of several experts. Dr. Richard Lemen, an epidemiologist, testified about the history of research linking asbestos in its various forms to diseases including mesothelioma. Dr. William Longo, a material scientist, testified about the concentrations of asbestos that would be released into the air by workers performing typical drywall work. Dr. Arnold Brody, a pathologist, testified regarding asbestos, including the chrysotile variety used in the drywall compound, as a recognized cause of mesothelioma and other diseases. Dr. Samuel Hammar, a pathologist, was Plaintiffs' expert on specific causation.

Hammar testified that any asbestos exposure above background levels causes mesothelioma. He testified that he had not reviewed the deposition testimony of Bostic and Harold. He reviewed the work history sheets but conceded they did not indicate the duration or intensity of exposure. Hammar, Brody, and Lemen repeatedly testified that "each and every exposure" to asbestos was a cause of Bostic's

disease.[94] Longo conceded that his studies did not attempt to "mimic any one person's actual exposure to asbestos," so he made no attempt to measure Bostic's actual aggregate dose assignable to Georgia–Pacific or any other source.[95]

■ We conclude, under the principles stated above, that the causation evidence was legally insufficient to uphold the verdict. Proof of substantial factor causation requires some quantification of the dose resulting from Bostic's exposure to Georgia–Pacific's products. Plaintiffs did not establish even an approximate dose. In-

stead, the expert testimony was to the effect that any exposure was sufficient to establish causation, a theory we rejected in *Flores.* Plaintiffs' counsel reinforced this testimony in opening and closing argument by embracing the any exposure theory. In opening counsel argued:

> [W]e have the burden of proof. . . . And we assume that burden and will prove this case to you by meeting that burden of proof. To prove our case that it is more likely true than not true that Georgia–Pacific sold an asbestos product, that Timothy Bostic was exposed to this asbestos product, and that he died as a

94. For example, Hammar testified:

> Q: And is it fair to say then that to a reasonable degree of medical probability, that if somebody has mesothelioma that each and every exposure to asbestos that that person had would be a significant contributing factor to the development of mesothelioma?
> A: I believe so, at least potentially a contributing factor, yes.
>
> \* \* \*
>
> Q: And did each and every exposure that Timothy Bostic had to Georgia Pacific joint compounds and wallboard materials increase his risk of mesothelioma?
> A: Yes.
>
> \* \* \*
>
> Q: And is that consistent with your opinion that each and every exposure to asbestos is a contributing factor?
> A: Yes.
>
> \* \* \*
>
> Q: And do you agree that each and every exposure that he had to asbestos, regardless of the source to the extent he had an exposure, that those were significant and contributing factors in the development of his mesothelioma?
> A: Yes.

Brody agreed that "each and every exposure that a person has to asbestos contributes to their risk for developing disease," and that "you have to consider that each and every one of those exposures played a role in the development of the disease." He agreed that "each and every one of the asbestos fibers that a person inhales into their lungs has to

be considered a cause" of his mesothelioma. Lemen agreed that "each and every exposure that somebody has . . . increase[s] their risk of developing mesothelioma." He agreed that "any exposure" and "each exposure" to asbestos "caused [Bostic's] mesothelioma."

95. Longo's experiments measured the intensity of exposure a worker might encounter while performing various drywall tasks. He did not attempt to establish Bostic's actual aggregate dose. We think Georgia–Pacific's expert, Dr. William Dyson, correctly explained the difference between intensity of exposure and dose:

> [A]ll diseases, including those associated with asbestos, follow a dose-response relationship. And a dose is the multiplication product of the exposure intensity times the exposure duration. Those are the two components of dose. So measuring the airborne concentration in fibers per cubic centimeter or a million particles per cubic foot is a measure of the intensity of the exposure or the level of exposure in the air. Then you take the duration of that exposure, and those two components give you dose.

Dyson further explained that "dose is a two-component factor. It's the intensity of exposure, which are the measurements that Dr. Longo provides us here but also the duration of exposure." *See also* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 633, 638 n. 12 (Fed.Jud.Ctr.3d ed.2011) ("Dose is a function of both concentration and duration.").

result of the exposure to this and other asbestos products.

In closing counsel argued:

The first part of this [jury] question is proximate cause, and that's what I want to talk to you about first. . . . And in this case, you have seen that Timothy Bostic did have more than just one exposure to asbestos. And at no point in this trial have we ever said that one of those exposures you could just pull out and forget about it. You're [ ] not going to hear us say that. You didn't hear our experts say that. *Each and every exposure is a contributing factor to the disease.* That's just the science. *But when more than one exposure comes together to cause a disease, they're all responsible.* You can't just separate one out.

Counsel invited the jury to find that any exposure was sufficient to impose liability and that aggregate and relative dose did not matter.

Rather than attempting to quantify the aggregate dose of asbestos attributable to Georgia–Pacific's products, Plaintiffs' experts expressly eschewed this approach in favor of the view that any exposure at all was sufficient to constitute a cause of the disease, even though Hammar, Brody, and Lemen conceded that all asbestos diseases are dose-related,[96] Brody conceded that everyone has some asbestos in his lungs, but at levels too low to cause disease,[97] and Lemen conceded that "the only way to adequately study subjects and their risk of developing disease is to study the exposure they have." We agree with the Pennsylvania Supreme Court that an expert opinion embracing the any exposure theory while recognizing that the disease is dose-related "is in irreconcilable conflict with itself. Simply put, one cannot simultaneously maintain that a single fiber among millions is substantially causative, while also conceding that a disease is dose responsive."[98]

Not only did *Flores* reject the any exposure theory, but Plaintiffs' experts purported to rely on studies that contradicted or at least did not confirm a theory that each and every exposure should be treated as a substantial cause of the disease. For example, Brody, Lemen, and Hammar purported to rely on a repore[99] of the

96. Hammar testified:

Q: Now, Doctor, that leads me to the next question, which is: Are asbestos-related diseases what we call dose-related diseases?
A: Yes.
Q: What does that mean?
A: That means that the cumulative dose, at least up to the point at least in cancer where the first cell developed, were all causative or potentially causative of disease. And that basically means that the more asbestos exposure you have the greater the risk of developing asbestos-related disease.

He agreed "if you were to look at it from a probability point of view" that "higher levels may contribute more to the development of the disease than exposures at much lower levels. . . . I would give you that at least from a probability point of view, the more exposure to asbestos that you have from any given exposure, the more likely that that exposure is to contribute to the development of that mesothelioma." Brody similarly agreed that "[a]ll these [asbestos] diseases are so-called dose response diseases. That means the more you're exposed to, the more likely you are to get [the] disease." He later testified that because Bostic worked only nine months at the Knox Glass plant his risk of disease would be less than the risk of employees who had worked at the plant for 20 years. Lemen agreed "that asbestos-related diseases were dose-response diseases." He stated: "I think the jury should understand that the higher the exposure, the more the risk increases."

97. *See supra* note 22.

98. *Betz v. Pneumo Abex, LLC*, 615 Pa. 504, 44 A.3d 27, 56 (2012).

99. *Consensus Report, Asbestos, Asbestosis, and Cancer: the Helsinki Criteria for Diagnosis*

"Helsinki Conference" on asbestos disease which states that while mesothelioma can occur in cases of low exposure, "very low background environmental exposures carry only an extremely low risk."[100] Brody also relied on an article by Philip Landrigan and others finding it "widely accepted that asbestos fibers, including chrysotile fibers, increase the existing risk of developing lung cancer in proportion to the cumulative exposure that occurred up to a time 10 years prior to evaluation."[101] Brody repeatedly testified that minimal exposure to asbestos does not cause mesothelioma.[102]

Hammar and Lemen testified that any exposure to asbestos should be treated as a cause of Bostic's mesothelioma. In reaching this conclusion they relied in part on publications in the Federal Register, including a 1977 report of the Consumer Product Safety Commission[103] (CPSC) proposing to ban asbestos-containing patching compounds. This report was not itself a peer-reviewed epidemiological study, although it cited a number of studies. It concluded, based in part on theoretical arguments, that "[a] 'no effect' level theoretically may exist, but it has not been demonstrated. Therefore, there is no known threshold below which exposure to respirable free-form asbestos would be

considered safe."[104] Lemen also discussed 1972 OSHA regulations concerning asbestos exposure standards. This publication recognized "controversy as to the validity of the measuring techniques" and "controversies concerning the relative toxicity of various kinds of asbestos," but concluded that in view of the risk of not acting "it is essential that the exposure be regulated now, on the basis of the best evidence available now, even though it may not be as good as scientifically desirable."[105] These publications are not scientific studies, and while a federal agency may be authorized to ban a product based on the lack of proof of its safety,[106] a "fundamental principle" of Texas products liability law "is that the plaintiff must prove that the defendants supplied the product which caused the injury."[107] Because "[o]ur legal system requires that claimants prove their cases by a preponderance of the evidence," our law "lags science; it does not lead it."[108] Like the CPSC, Lemen could not state that "there is not a safe level" of asbestos. Instead, his testimony was that "we don't know really how much exposure it takes to cause mesothelioma," and that "one of the reasons we recommend banning of asbestos, all types of asbestos, is because that level is so low that we have not been able to measure that level." As

*and Attribution*, 23 SCANDINAVIAN J. WORK, ENV'T & HEALTH 311 (1997).

100. *Id.* at 313.

101. Philip J. Landrigan et al., *The Hazards of Chrysotile Asbestos: A Critical Review*, 37 INDUS. HEALTH 271, 273 (1999).

102. *See supra* notes 22–23.

103. Respirable Free–Form Asbestos, 42 Fed. Reg. 38782 (July 29, 1977).

104. *Id.* at 38786.

105. Standard for Exposure to Asbestos Dust, 37 Fed.Reg. 11318, 11318 (June 7, 1972).

106. For example, the FDA "may make regulatory decisions ... based on postmarketing evidence that gives rise to only a suspicion of causation." *Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 1320, 179 L.Ed.2d 398 (2011). Hence, "efforts to invoke ... regulatory standards are also ineffectual in terms of substantial-factor causation, since the most these can do is suggest that there is underlying risk from the defendants' products...." *Betz*, 615 Pa. 504, 44 A.3d at 55.

107. *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex.1989).

108. *Havner*, 953 S.W.2d at 728.

noted above, Lemen testified that for all carcinogens, the threshold at which the risk of disease falls to zero is unknown. Brody similarly testified that "no one's ever been able to show a level that will prevent everyone from getting mesothelioma." Assuming this testimony is factually correct, the failure of science to isolate a safe level of exposure does not prove specific causation in today's case, but the any exposure theory in effect asks the Court to do so. As noted above, one court, in refusing to admit Hammar's any exposure testimony, observed that "Dr. Hammar wants to be allowed to tell a jury that all of the plaintiff's *possible* exposures to asbestos during his entire life were contributing causes of the plaintiff's cancer, and, therefore, sufficient to support a finding of legal liability.... Just because we cannot rule anything out does not mean we can rule everything in."[109] Stated another way, the inability of science to establish a maximum safe dose does not mean that science cannot establish a statistically significant link between a dose and the disease. It seems to us that all other things being equal, the more toxic the substance, the easier it should be to establish a *Havner*-compliant statistical link.

So far as we can tell, none of the peer-reviewed scientific studies on which Plaintiffs' experts relied found a statistically significant link between mesothelioma and occasional exposure to joint compounds comparable to Bostic's exposure, namely

the occasional exposure of a son helping his father on building renovation projects that were not the primary occupation of either father or son, and which included drywall work as well as other construction activities. For example, Lemen testified about one of his own published articles[110] which relied on a study of a Chinese asbestos plant where workers were employed at the plant, presumably full-time, for an average of over two decades.[111] While, as Lemen reported, the study of the Chinese plant met standards we recognized in *Havner* (a relative risk of 4.29, with a confidence level of 95% and a confidence interval of 2.17 to 8.46), the cohort studied consisted of individuals whose circumstances were very different from those of Bostic. Lemen also discussed a study by Frank Stern and others[112] of union plasterers and cement masons where the authors made reference to another study of drywall construction which found asbestos fiber concentrations "similar to those measured in the work environment of asbestos insulation workers who"[113] in yet another study by Irving Selikoff and others[114] "had a seven-fold increased risk of cancer of the lung and of the pleura."[115] However, the Stern and Selikoff studies were of workers employed in the trades studied, not persons like Bostic who performed occasional drywall work outside of their primary employment. Further, the Stern study found that the correlation between employment in the trades studied

**109.** *Smith v. Ford Motor Co.,* 2013 WL 214378, at *3 (D.Utah Jan. 18, 2013).

**110.** Richard A. Lemem, *Chrysotile Asbestos as a Cause of Mesothelioma: Application of the Hill Causation Model,* 10 INT'L J. OCCUPATIONAL & ENVTL. HEALTH 233, 235 (2004).

**111.** Eiji Yano et al., *Cancer Mortality Among Workers Exposed to Amphibole–Free Chrysotile Asbestos,* 154 AM J. EPIDEMIOLOGY 538 (2001).

**112.** Frank Stern et al., *Mortality Among Unionized Construction Plasterers and Cement Masons,* 39 AM J. INDUS. MED. 373 (2001).

**113.** *Id.* at 383.

**114.** Irving J. Selikoff et al., *Mortality Experience of Insulation Workers in the United States and Canada,* 1943–1976, 330 ANNALS N.Y. ACAD. SCIS. 91 (1979).

**115.** Stern, *supra* note 112, at 383.

and mesothelioma was "not statistically significant,"[116] despite special efforts by the authors to manually review death certificates "to obtain a more accurate assessment of mesothelioma-related deaths in this cohort."[117] In *Havner*, we held that the plaintiff "must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies ... and that the timing of the onset of injury was consistent with that experienced by those in the study."[118] Without such a showing, "epidemiological studies are without evidentiary significance."[119] While the exposure of those in the study need not exactly match the plaintiff's exposure, "the conditions of the study should be substantially similar to the claimant's circumstances,"[120] a requirement that was not met.

Plaintiffs' experts did not show, through reliance on scientifically reliable evidence, that Bostic's exposure to asbestos from Georgia–Pacific's products more than doubled his risk of contracting mesothelioma.

 Evidence was presented of another source of asbestos exposure, namely Bostic's employment at Knox Glass, where he was exposed to asbestos from numerous sources. Hammar testified that Bostic's exposure to asbestos from Knox Glass was minimal as compared to his exposure from construction, but this testimony was conclusory, as it was not based on any scientific studies or any scientific attempt to measure the relative exposures. An expert's testimony that brings no more than "his credentials and a subjective opinion" will not support a judgment.[121] The testimony may also have been based on an incorrect assumption that Bostic's primary occupation was in construction, because the work history sheets Hammar reviewed made no mention of Bostic's employment with the TDCJ.[122] "[C]ourts must look beyond the bare opinions of qualified experts and independently evaluate the foundational data underlying an expert's opinion in order to determine whether the expert's opinion is reliable."[123] If the testimony is not reliable, it is not evidence.[124] Further, another of Plaintiffs' experts, Dr. Brody, testified that if, as was the case, Bostic worked nine months at the Knox Glass plant and had amosite asbestos in his lungs, that exposure "substantially contributed to his mesothelioma." Without any meaningful and scientific attempt to quantify the exposures from the two sources, the testimony was legally insufficient, for there was no meaningful way for the jury to conclude that Bostic's exposure to Georgia–Pacific's products was a substantial factor in causing his disease, nor was there any basis for the jury to apportion liability between these two sources of asbestos. In

**116.** *Id.* at 376.

**117.** *Id.* at 381.

**118.** 953 S.W.2d at 720.

**119.** *Flores,* 232 S.W.3d at 771.

**120.** *Merck,* 347 S.W.3d at 266.

**121.** *Havner,* 953 S.W.2d at 712.

**122.** Hammar testified, incorrectly, that from his review of the work history sheets Bostic "actually worked in construction primarily" and "it looked to me like his primary occupational exposure itself was actually in the construction industry." "We are not required ... to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect." *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 912 (Tex.2004).

**123.** *Merck,* 347 S.W.3d at 262.

**124.** *Havner,* 953 S.W.2d at 713.

*Flores* we found the evidence of causation legally insufficient not only because of the plaintiff's failure to establish his aggregate dose but also his failure to "introduce evidence regarding what percentage of that indeterminate amount may have originated with [Defendant] Borg–Warner's products" as opposed to "other brands of brake pads." [125]

The dissent would hold the causation evidence legally sufficient if an expert testified that exposure to a defendant's product was "significant." In bringing this suit Plaintiffs claimed exposure from 40 defendants, and the case as Plaintiffs tried it to the jury (1) relied on opening and closing arguments and on multiple experts who repeatedly testified [126] that any exposure to asbestos should be considered a cause of Bostic's disease, (2) failed to quantify, even approximately, the aggregate dose, (3) failed to quantify, even approximately, the dose attributable to Georgia–Pacific, and (4) failed to show that the dose fairly assignable to Georgia–Pacific more than doubled Bostic's chances of contracting mesothelioma. The evidence was sufficient only if proof of some exposure is sufficient to establish causation. It is not. The essential teaching of *Flores* is that dose matters, and this requirement applies to mesothelioma cases.

For these reasons, we conclude that the evidence of causation was legally insufficient to sustain the verdict in this case.

### III. Conclusion

While we do not agree with all of the language of the court of appeals' decision, that court reached the correct result in reversing the trial court's judgment and rendering a take-nothing judgment. We affirm the court of appeals' judgment.

Justice GUZMAN filed a concurring opinion.

Justice LEHRMANN filed a dissenting opinion, in which Justice BOYD and Justice DEVINE joined.

Justice GUZMAN, concurring.

Over the last several decades, asbestos litigation has become ubiquitous in our federal and state courts. In Texas, the Court has decided a handful of seminal cases articulating a legal framework for toxic torts in the context of asbestos litigation. Here, though the Court correctly deems the evidence of causation legally insufficient, I write separately because my approach is more nuanced in that I believe proving an occasional exposure mesothelioma case with epidemiological studies is not an impossible task. I also write to note my belief that the asbestos litigation framework proposed by the dissent fails to adhere to our well-settled precedents as they relate to the preponderance of evidence standard. In short, I am concerned that both writings do not faithfully interpret the preponderance of the evidence standard that stands as the lodestar of civil liability in Texas. A plaintiff must always prove his toxic tort claim by this standard: Nothing less will suffice, but nothing more is required.

When we allowed scientific rather than direct proof for toxic torts in *Havner*, we interpreted the preponderance standard to mean that a plaintiff must prove he was exposed to a dose of the toxin that more than doubled his risk of injury. In *Flores* and here, the preponderance standard demands that if the plaintiff was exposed to toxins from multiple defendants, he must nonetheless prove he was exposed to a dose of the defendant's toxin that more

---

**125.** 232 S.W.3d at 772.

**126.** *See supra* note 94.

than doubled his risk of injury. Any standard above or below this threshold fails to comport with the preponderance standard as articulated by this Court.

This matter requires us to apply the preponderance of the evidence standard to mesothelioma cases, and I fear that while the Court may demand too much, the dissent misconstrues our precedents to require too little. The Court holds here that the plaintiff's epidemiological studies were insufficient because they were not "the occasional exposure of a son helping his father on building renovation projects which were not the primary occupation of either father or son, and which included drywall work as well as other construction activities." 439 S.W.3d 332, 364. But we have only required substantially similar—not completely identical—epidemiological studies. Plaintiffs must resolve any differences between the studies and the plaintiff's pattern of exposure through reliable scientific evidence. Here, the plaintiff offered epidemiological studies of occupational exposure that were extrapolated to purportedly measure risk from occasional exposure. But the plaintiff never substantiated those extrapolations, yielding an analytical gap in his proof of causation. Nonetheless, I agree with the Court that the plaintiff failed to prove his approximate dose of exposure to the defendant's asbestos. Thus, I join the Court's opinion except for parts II.A.3 and II.B.

If the Court arrives at the correct result by potentially setting the evidentiary bar too high for future claimants, the dissent reaches an implausible conclusion by neglecting the preponderance standard as established by our precedents. Not requiring quantifiable evidence that a defendant's asbestos product more than doubled the risk of harm, as the dissent proposes, eases the required burden of proof to something subaltern to a preponderance of the evidence. While mesothelioma is a unique disease in that relatively limited exposure can induce illness, this does not change the burden of proof. It simply permits the plaintiff to present lesser dosage evidence (*i.e.*, epidemiological studies for mesothelioma will show more than a doubling of the risk at a lower dose, and plaintiffs need only show exposure comparable to this dose). The pathological peculiarities of mesothelioma should not render a plaintiff's claim almost impossible to prove or almost impossible to lose. Therefore, I respectfully concur in the Court's judgment.

## I. Legal and Factual Background

This Court's foundational case for proving causation in toxic torts matters is *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 708 (Tex.1997). *Havner* addressed litigation surrounding a drug for pregnant mothers that was alleged to have caused birth defects.[1] *Id.* In *Havner*, we held that where direct, scientifically reliable proof of causation was unavailable, epidemiological studies can prove causation, provided they comply with burden of proof requirements. *Id.* at 715. After a comprehensive review of the applicable academic literature, we established that the burden of proof is satisfied when properly-conducted studies establish more than a "doubling of the risk" caused by the toxic tortfeasor, as this strikes "a balance between the needs of our legal system and the limits of science."[2] *Id.* at 717–18.

1. Causation can be general (whether a substance is capable of causing a particular injury or condition in the general population) or specific (whether a substance caused a particular individual's injury). *Havner,* 953 S.W.2d at 714.

2. We noted:

*Havner* specifically addressed a single defendant and a non-asbestos tort, but *Borg–Warner Corp. v. Flores* involved multiple defendants in a products liability action involving asbestos. 232 S.W.3d 765, 766 (Tex.2007). The Court recognized "the proof difficulties accompanying asbestos claims," and accordingly did not demand that causation be proved with "mathematical precision." *Id.* at 772–73. Although the Court only briefly discussed *Havner*, it integrated its reasoning. For instance, while epidemiological studies were not presented in *Flores*, the Court noted that had such studies been introduced, they would have had to show that brake mechanics (the occupational class of the plaintiff) "face at least a doubled risk of asbestosis." *Id.* at 772.[3]

In the wake of *Havner* and *Flores*, then, a plaintiff employing epidemiological studies to prove causation must set forth reliable studies showing exposure to a dosage that more than doubles the risk of injury (general causation) and that the plaintiff's exposure to the defendant's toxin was comparable to or greater than the more than doubling of the risk dose in the studies (specific causation). The standard will be the same for both asbestosis and mesothelioma cases, though the epidemiological studies will likely vary considerably depending upon the ailment involved given that different exposure levels are associated with each illness.[4] The studies might differ depending upon the type of the asbestos involved as well.[5]

## II. The Court's Methodology

I agree with the Court's ultimate conclusion that Bostic did not produce epidemiological studies that complied with *Havner* and failed to prove his approximate dose of exposure to Georgia–Pacific asbestos. Because I believe the Court's opinion may be interpreted to foreclose recovery in a mesothelioma case based on occasional exposure to asbestos, I expound on this issue.

[T]he law must balance the need to compensate those who have been injured by the wrongful actions of another with the concept deeply imbedded in our jurisprudence that a defendant cannot be found liable for an injury unless the preponderance of the evidence supports cause in fact. The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science.

*Id.* at 718.

**3.** We also cited *Havner* for the proposition that dosage is germane: "We have held that epidemiological studies are without evidentiary significance if the injured person cannot show that 'the exposure or dose levels were comparable to or greater than those in the studies.'" *Flores*, 232 S.W.3d at 771 (quoting *Havner*, 953 S.W.2d at 720–21).

**4.** The most common diseases that might result from asbestos exposure are (1) Asbestosis: a diffuse, interstitial, nonmalignant, scarring of the lungs; (2) Bronchogenic carcinoma: a malignancy of the interior of the lung; (3) Mesothelioma: a diffuse malignancy of the lining of the chest cavity (pleural mesothelioma), or of the lining of the abdomen (peritoneal mesothelioma); and (4) Cancer of the stomach, colon, and rectum. Consumer Product Safety Commission, 42 Fed.Reg. 38,-782, 38,784 (proposed July 29, 1977) (to be codified at 16 C.F.R. pts. 1304 and 1305); *see also Flores*, 232 S.W.3d at 771 ("It is generally accepted that one may develop mesothelioma [in contrast to asbestosis] from low levels of asbestos exposure." (citations omitted)).

**5.** "There are six basic varieties of asbestos minerals which are found in fiber form: chrysotile (the most common variety, and that ordinarily found in asbestos-containing products), amosite, crocidolite, actinolite asbestos, tremolite asbestos, and anthophyllite asbestos. Most of the world supply of commercial asbestos is chrysotile, the fibrous form of serpentine." Consumer Product Safety Commission, 42 Fed.Reg. at 38,784.

Here, though the parties strongly contested nearly every issue in this matter, they appear to concede that *Havner* controls. As to *Havner*, the crux of their disagreement centered on its application. At oral argument, Georgia–Pacific argued that *Havner* precludes Bostic from recovering, because "without dose evidence, you cannot do a *Havner* analysis."[6] Bostic's attorneys countered that they furnished epidemiological studies that measured exposure to a dosage and asbestos type sufficiently analogous to those experienced by Bostic.[7] Thus, despite the interpretative differences, both parties articulated their arguments consistent with the framework we established in *Havner*.

I believe Georgia–Pacific advances the more cogent argument. All but one of the studies Bostic presented were not sufficiently analogous to his situation to meet *Havner* and *Flores* standards; for instance, these studies largely concerned occupational exposure, which measures a much different phenomenon than the occasional exposure Bostic experienced.

The Consumer Product Safety Commission (CPSC) report, however, is based on a much more similar pattern of exposure to that of Bostic.[8] Deriving its statistics from "epidemiological data in the literature," it tied comparatively low levels of asbestos exposure to increased risk of injury.[9] Specifically, it detected increased risk of asbestos-related diseases stemming from exposure to drywall products that were used "six hours a day four times a year"—what it termed "high yet reasonably foreseeable" usage.[10] This is much closer to the exposure allegedly experienced by Bostic in regard to Georgia–Pacific's product. Extrapolating from that dosage, the CPSC concluded that even on the low end, the result would be a ten-fold increase in the risk of illness.[11]

6. *See* Transcript of Oral Argument at 11.

7. Counsel for Bostic stated:

[T]here were studies showing absolutely that chrysotile asbestos causes mesothelioma and then in terms of the claim of Georgia–Pacific, and this is very important, Georgia–Pacific is stating that we need low-dose chrysotile-only studies to survive the causation challenge in this case and that is wrong for two reasons. First, it's not relevant to this Record because this record showed that the Georgia–Pacific joint compound that Timothy Bostic used, while it was trace amounts, still had millions of tremolite fibers in it.... [S]econd, pure low-dose chrysotile studies do not exist because people are not exposed solely to chrysotile fibers. People are exposed like Timothy Bostic was to mixed fibers and *Havner* recognized that you're dealing with retrospective exposure analyses. We can't go out and put somebody in a test chamber and say we're going to expose you to this amount of chrysotile asbestos and then that amount of chrysotile asbestos since you're a baby and then wait 40 years and see if that was sufficient.

*Id.* at 19.

8. Consumer Product Safety Commission, 42 Fed.Reg. at 38,782.

9. *Id.* at 38,787. Though not a peer-reviewed academic study, the CPSC report was predicated on a study by Skelikoff of three separate cohorts.

10. *Id.*

11. In the relevant part, the report provided:

For purposes of this assessment, the Commission considered the use of patching compounds by a consumer, for six hours a day four times a year, to be a high yet reasonably foreseeable yearly exposure. The increased risk of death from respiratory cancer induced by this yearly exposure is estimated at between 10 and 2,000 per million. For five years of exposure at these levels, the risk increases geometrically and is estimated at between 1,000 and 12,000 per million. Based on current information, the Commission estimates that the lower estimate of 10 per million is closer to the actual risk for a one year exposure. *Id.*

However, I am troubled by two aspects of Bostic's reliance on the CPSC report. First, no evidence supported the extrapolation from the foundational data to the projected risk rates. The underlying epidemiological studies on which the report was based measured occupational exposure. To assess the equivalent risk from occasional exposure such as through consumer products, the CPSC made calculations it retained at its offices based on a published theoretical model. The Court has never held that such extrapolations violate *Havner*, but as we recently held in *Merck & Co. v. Garza*, there must be some "scientific basis" for the extrapolation. 347 S.W.3d 256, 267 (Tex.2011). Here, the published study and CPSC calculations form that scientific basis, but Bostic never admitted them into evidence. Thus, the lack of evidence regarding the scientific basis for the extrapolation amounts to an analytical gap in this particular case.

Second, as was the case with the eponymous plaintiff in *Flores*, Bostic failed to prove his dose was comparable to or greater than the dose in the study. He vigorously contests this, citing the accommodating language of *Flores* regarding scientific proof. *See* 232 S.W.3d at 772–73. But even if *Flores* did not require numerically precise dosage, some reasonable approximation is required to satisfy causation. Bostic failed to marshal such an approximation because, as the Court's thorough analysis indicates, testimony only indicated one drywall job where Bostic's father recalled using Georgia–Pacific joint compound, and the father did not recall if Bostic was present during that job.[12] As

in *Flores*, this is insufficient evidence of an approximate dose.

It bears noting that even though Bostic failed to prove his case, the preponderance standard does not present an insuperable hurdle for all occasional exposure mesothelioma cases. While the bulk of epidemiological studies appear to focus on occupational exposure, properly substantiated extrapolations can bridge the gap between those studies and the plaintiff who contracted mesothelioma from occasional exposure to asbestos. But such a plaintiff must provide a reliable scientific basis for the extrapolation and exposure to a dose of the defendant's toxin comparable to or greater than the extrapolated dose that more than doubled the risk of injury. Here, Bostic failed to do either.

The Court also seems to improperly apply its own articulated standard governing how closely-tailored an epidemiological study must be to a plaintiff's demonstrated exposure. Interestingly, the Court rightly notes that the exposure measured in the studies and stemming from the plaintiff's own experience need only be "substantially similar," not precisely congruent. 439 S.W.3d at 361 (quoting *Garza*, 347 S.W.3d at 266). Although the Court advances the proper standard, it seems to misapply it by dismissing all of Bostic's epidemiological studies because they were not "the occasional exposure of a son helping his father on building renovation projects which were not the primary occupation of either father or son, and which included drywall work as well as other construction activities." 439 S.W.3d at 361. As a practical matter, requiring this level of exactitude may imply that hardly any mesothelioma

---

12. The Court does a thorough job of cataloguing Bostic's exposure. As it demonstrates, the only evidence that Bostic was exposed to Georgia–Pacific's joint compound were statements from Bostic and his family, and many of these statements were highly speculative.

While there is little doubt that Bostic was exposed to asbestos-containing products, there is significant uncertainty as to the extent that Georgia–Pacific's products were involved.

plaintiff can recover. Indeed, experts have long-acknowledged that asbestos encompasses a broad panoply of constituent types and forms; for instance, there are six types of asbestos fibers, and they may be in either friable or encapsulated form. *See supra* note 5. The CPSC report was predicated on epidemiological studies involving asbestos insulation that contained friable, principally chrysotile fibers. This type of exposure is substantially similar to Bostic's exposure for two reasons. First, both information in the studies and in the record indicate that asbestos exposure from joint compound is more severe than that from insulation.[13] Second, the underlying evaluation informing the CPSC report's calculation was a study of predominately friable, chrysotile asbestos, and Georgia–Pacific's joint compound principally contained chrysotile asbestos. The thrust of *Havner* is that we will allow a plaintiff to recover if science can bridge the gap in proof of causation. Requiring perfectly congruent epidemiological studies when science can fill potential analytical gaps undercuts the very purpose of *Havner*.

Lastly, I cannot join Part II.A.3 of the Court's opinion because of the potential conflict between its articulation of substantial factor causation and the Texas comparative fault statute. The Court believes that substantial factor causation means that a defendant whose toxin more than doubled the plaintiff's risk of injury may not be liable if exposure to another defendant's toxin was at a factor 10,000 times more. 439 S.W.3d at 361. For simplicity's sake, assume a jury found a lesser such defendant 1% at fault and the greater defendant 99% at fault. Applying the

Court's view of substantial factor causation to this scenario is problematic. If the Court's interpretation of substantial factor causation requires the defendant found 99% at fault to assume the remaining 1% liability, this runs afoul of the comparative fault statute—the purpose of which is to make each defendant liable for its percentage fault. And if the Court's interpretation requires the plaintiff to assume the remaining liability, this conflicts with our long-standing tradition that a plaintiff can recover the percentage attributable to the defendant after carrying his burden by a preponderance of the evidence. The Court's injection of an ostensibly common sense approach to causation unnecessarily skews the preponderance standard (just in the opposite direction that the dissent's common sense approach does, as addressed below). This deviation from the preponderance standard we have long adhered to is unwarranted, especially in a case where it does not apply.

## III. The Dissent's Methodology

If the Court impliedly requires too much of a mesothelioma plaintiff in requiring overly congruent epidemiological studies, the dissent errs in the opposite direction—significantly and errantly easing the burden of proof requirement to something below a preponderance of the evidence. First, it misapprehends *Havner*, suggesting that the case need not apply because Bostic has offered sufficient direct evidence, and therefore alternative methods of proving causation are unnecessary. I disagree. While Bostic introduced evidence of exposure to Georgia–Pacific products containing asbestos, the evidence

---

**13.** The underlying data for the CPSC report indicated that insulators were exposed to 15 fibers per cubic centimeters (f/cc) of air for their half day of work, compared to 35.4 to 59.0 f/cc for dry-mixing joint compound, 1.3 to 16.9 f/cc for hand-sanding joint compound, 41.4 f/cc sweeping the dust after applying joint compound, and 26.4 f/cc 35 minutes following sweeping.

lacked sufficient specificity. As previously addressed, Bostic's father cited eight discrete examples of drywall jobs, but only recalled using Georgia–Pacific's product in one such job and did not remember whether his son was present for that project. Moreover, Bostic cannot tie a specific manufacturer's asbestos fiber to his ailment. While this is an admittedly formidable evidentiary task, it does not automatically mean, as the dissent suggests, that traditional notions of causation can be relaxed. As the Court rightly notes, a mesothelioma plaintiff asserting a claim stemming from occasional exposure from multiple asbestos sources has a more challenging task than a plaintiff with well-documented occupational exposure from a single source. 439 S.W.3d at 364. The former plaintiff may still recover, but he must prove causation with evidence that comports with a preponderance of the evidence standard. Here, there is no direct evidence that Georgia–Pacific asbestos fibers caused Bostic's mesothelioma, so Bostic must rely on an alternative method of proving causation. While the dissent found the expert testimony offered by Bostic's witnesses sufficiently specific to prove causation, I believe that the burden of proof demands more closely-tailored evidence.

Second, the dissent overstates the scientific hurdles confronting a mesothelioma plaintiff attempting to prove *Havner* causation. While it contends that "no epidemiological study has established the threshold of exposure over which the risk of developing mesothelioma is doubled" for intermittent exposure, the epidemiological studies in the CPSC report cited previously may serve as a baseline for future mesothelioma plaintiffs with occasional exposure (provided that they substantiate the extrapolation and their approximate dose). 439 S.W.3d 332, 361 (Lehrmann, J., dissenting). In short, then, *Havner* permits a mesothelioma plaintiff to prove causation

and recover in tort, and at least one scientific study may exist as a benchmark. Bostic merely failed to sufficiently relate the epidemiological studies in the CPSC report to his own case or submit proper evidence that his dose was comparable to or greater than that in the study. Thus, his failure to prove specific causation renders his claim unrecoverable.

More generally, I fear that the dissent's failure to pronounce a clear standard risks instilling confusion in our courts, where future asbestos litigation will inevitably occur. A plaintiff may recover by direct evidence of causation, or may attempt to prove alternative causation consonant with *Havner*'s framework. Regardless of the litigation path trod, causation must be proved by a preponderance of the evidence. This standard is satisfied differently depending upon whether direct or *Havner* evidence is involved, but under either approach, the plaintiff faces the same burden of proof. We must not dilute the preponderance of the evidence standard that has stood as a hallmark of toxic tort litigation in order to make mesothelioma cases easier to prove. We have declined prior invitations from tort claimants to weaken the preponderance of the evidence standard as it relates to scientific proof of causation. *See Havner*, 953 S.W.2d at 730; *Flores*, 232 S.W.3d at 774. I join the Court in declining to do so today.

Accordingly, I join all but Parts II.A.3 and II.B of the Court's opinion and concur in the judgment.

Justice LEHRMANN, joined by Justice BOYD and Justice DEVINE, dissenting.

Throughout history, science has informed our society in important ways. Educated people once believed that the sun orbited the earth, until Nicolaus Copernicus used geometry and astronomy to

prove a heliocentric model of the solar system. Doctors once accepted that illness was carried by poisonous vapors, until experiments by Louis Pasteur and others provided support for germ theory. In the same way, the Court's opinion suggests that a person must be exposed to asbestos in large quantities before he develops mesothelioma as a result of his exposure. However, reliable science has now demonstrated that even low levels of exposure to asbestos are sufficient to cause the disease. *Borg–Warner Corp. v. Flores*, 232 S.W.3d 765, 771 (Tex.2007) (citing 3 DAVID L. FAIGMAN ET AL., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY § 28:5 (2007)).

In this case, the Court ignores this advance in scientific research and holds that a jury's verdict must be set aside because the Bostics, the petitioners here, did not present evidence demonstrating a threshold of exposure to asbestos above which a person's risk of developing mesothelioma is doubled. To arrive at this holding, the Court conflates the alternative measure of proof we announced in *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex.1997), and the understanding of substantial-factor causation we approved in *Flores*, 232 S.W.3d at 770. This combination is both illogical and inequitable. The Bostics showed by direct, scientifically reliable evidence that Timothy Bostic's mesothelioma was caused by exposure to asbestos, and that he was exposed to Georgia–Pacific's asbestos-containing products in substantial quantities. Because the Court holds that this evidence was insufficient to sustain a jury verdict in their favor, I am compelled to respectfully dissent.

## I. Facts

In this case we consider the legal sufficiency of the Bostics' evidence on causation. Accordingly, a detailed review of that evidence is warranted. I begin by examining the testimony of the Bostics' expert witnesses on the nature and pathology of mesothelioma. Because Dr. Brody was the first expert to testify, I set forth his testimony more fully and then note the opinions with which other expert witnesses agreed. Next, I proceed to the testimony of Timothy Bostic and his father, Harold, who recounted Timothy's exposure to Georgia–Pacific's products. Finally, I conclude with the expert testimony of Dr. Longo, who determined Timothy's approximate level of asbestos exposure resulting from those products.

## A.

Dr. Arnold Brody is an experimental pathologist, which means that he studies diseases and their causes. At trial, Dr. Brody explained that the only known environmental cause of mesothelioma in North America is asbestos. He testified that scientists agree that smoking plays no role. Dr. Richard Lemen, an epidemiologist, concurred with Dr. Brody, adding that the only other known cause is radiation treatment for certain types of cancer. There was no testimony at trial that Timothy was ever treated with radiation.

Dr. Brody went on to explain that, though all people inhale some asbestos, accumulation at such "background" levels "does not produce disease." However, when a person is exposed to asbestos in amounts above background levels, every exposure "is contributing and making it more likely" that the individual will develop mesothelioma in the future. Dr. Brody explained that, though scientists have successfully established a threshold level below which exposure to asbestos does not cause asbestosis, scientists have been unable to establish a similar threshold with respect to mesothelioma. Dr. Lemen

agreed, adding that the reason scientists have not been able to establish that threshold is because it is "very low." He testified, "we've not been able to identify a safe level. It's not to say there is not a safe level, but one of the reasons we recommend [the] banning of asbestos ... is because that level is so low that we have not been able to measure [it]."

Dr. Brody also emphasized that individuals have different levels of susceptibility to mesothelioma depending on particular genetic factors, as with all carcinogens. Dr. Lemen elaborated on this point, stating that "[t]here are other factors besides the exposure ... individual characteristics, genetic make up of individuals, some individuals are more susceptible to developing disease than others." Dr. Lemen also noted that epidemiologists have not yet identified the factors that make one person more susceptible than another. Both doctors agreed, however, that children were especially vulnerable to the harmful effects of asbestos.

Using images from an electron microscope, Dr. Brody explained how a person develops mesothelioma, which is a type of cancer that afflicts the pleura, the thin membrane covering the lung. While lung cancer and asbestosis develop inside the lung, mesothelial cells are located outside the lung, which means that the asbestos fibers, once inhaled, must travel through lung tissue in order to cause mesothelioma. The fibers migrate through the lung tissue when they are picked up by macrophages and other types of cells. These cells then make their way into the "fluid flow of the lung," which includes blood vessels and lymphatic tissue. This pathway carries the asbestos-laden cells out of the lung and into the pleura, where mesothelial cells are located. Asbestos fibers are deposited in the pleura and, once deposited, can cause genetic errors in mesothelial cells. Dr.

Brody explained that "if a person has cancer, what you know is that the original cell that got that first error divided and passed on the error to the offspring." This same cell "a year or two years later" can be "hit again with another fiber," which causes the cell to "accumulate[ ] a second error." Eventually, a cell is exposed to a sufficient number of asbestos fibers and accumulates a sufficient number of genetic errors that cell growth becomes uncontrolled. Considering this process "from a molecular biology point of view," Dr. Samuel Hammar, another pathologist, confirmed that "a very brief exposure could be a critical exposure in the development of a single cancer cell."

Dr. Lemen testified that, when a person is exposed to the asbestos fibers of multiple manufacturers, there is no way for a scientist to determine who manufactured the fibers that actually migrated through the lung and triggered the genetic errors that resulted in mesothelioma. Dr. Hammar agreed. Even if a person is exposed to a large quantity of asbestos from product A, and a small quantity of asbestos from product B, it could be the product B fibers that traveled through the lung and into the pleura, causing the tumor to develop. For that reason, Dr. Lemen opined that it is impossible, in a mesothelioma case, for a scientist to determine which product or manufacturer was responsible on a cellular level for the person's condition.

## B.

Trial testimony revealed that Timothy Bostic was exposed to asbestos from more than one manufacturer's products. However, his earliest exposures were to Georgia–Pacific's joint compound. From the time he was five years old, Timothy helped his father, Harold, complete sheetrock work on residential construction projects.

Harold explained that, when undertaking these projects, he used Georgia–Pacific joint compound "98 percent of the time." He used Georgia–Pacific's product so frequently because, compared to other brands, it was "simply the best. Just the best." In his view, Georgia–Pacific's joint-compound was "by and far the No. 1." Timothy assisted his father by mixing the dry joint compound, sanding it after he had applied the mixture to drywall, and sweeping up the resulting dust at the end of a day's work. Harold had difficulty recalling exactly how many jobs he and Timothy completed together, but affirmed that Timothy had used Georgia–Pacific joint compound "[m]any, many, many times."

Timothy was also exposed to asbestos from the Knox Glass Company, which employed him for three summers and his father for twenty-two years. When Timothy was younger, he was exposed to fibers that were carried home on his father's clothes. However, Timothy's parents divorced when he was nine years old, reducing the amount of time he spent at home with Harold. When Timothy was older, he joined his father as a temporary employee of the company, where he worked for three summers. Timothy estimated that, during his time at the company, he worked for approximately three months, total, at the "hot end" of the plant, where asbestos was the most prevalent. The rest of the time, Timothy swept floors, cleaned, packed cartons, inspected bottles, cut asbestos cloth, and performed other tasks.

Finally, Timothy was exposed to asbestos from Palestine Contractors, where he worked for two summers. Timothy was employed as a welder's helper, and his job was to assist the principal welder with pipeline repairs, a task that included removing gaskets from the pipes. Some of the pipes Timothy encountered had been insulated with asbestos, exposing him to the fibers.

## C.

In order to shed light on the approximate quantity of asbestos Timothy inhaled, the plaintiffs called Dr. William Longo. Dr. Longo is a materials scientist, which means that he studies products like ceramics, metals, polymers, and bio-materials to determine their properties and the contexts in which they can be safely and effectively used. At trial, Dr. Longo testified about Timothy's exposure to Georgia–Pacific's products, which occurred during the period Timothy assisted his father with residential construction projects. Relying on his own calculations and a study performed by the Environmental Protection Agency, Dr. Longo estimated that a twenty-five pound bag of Georgia–Pacific joint compound contains an average of 11.4 quadrillion asbestos fibers. He also detailed the average concentrations of asbestos released when a person performed tasks related to the use of joint compound. In the experiment he conducted, before performing any sample tasks, Dr. Longo measured a background level of .0002 asbestos fibers per cubic centimeter in the room that would serve as the site for his study. After dry joint compound was sanded on the walls, the doctor measured an average concentration of 4.97 fibers of asbestos per cubic centimeter of air. When dust generated by the sanding was being cleaned up, Dr. Longo measured an average concentration of 4.7 fibers of asbestos per cubic centimeter of air. Dr. Longo noted that the precise quantity of asbestos released depends on many factors. But, after reviewing Timothy Bostic's work history, Dr. Longo testified that Timothy's exposure to Georgia–Pacific's product was "significant." When asked to clarify, Dr. Longo confirmed that he meant Timothy had been exposed to Georgia–Pacific's asbestos

at levels ten to twenty times the average background level. No objection was raised to this testimony at trial.

## II. Causation in Toxic Tort Cases

In toxic tort cases, we determine whether a plaintiff has proven causation by addressing three areas of inquiry: (1) General Causation: Does the toxin in question have the capacity to cause the type of injury sustained by the plaintiff? And if so, what dose, or amount of exposure, is required? (2) Specific Causation: Was the plaintiff's injury actually caused by the toxin? (3) Substantial–Factor Causation: When multiple manufacturers contribute to a plaintiff's exposure, was the toxin produced by the defendant a substantial factor in causing the plaintiff's injury? *See* David E. Bernstein, *Getting to Causation in Toxic Tort Cases,* 74 BROOK. L.REV. 51, 52, 55 (2008). In this part, I explain why the alternative standard of proof we announced in *Havner* is only useful for resolving the first two causation questions, and is not useful for resolving the third causation question: whether exposure to one of several defendants' products was a substantial cause of the plaintiff's harm. I argue that the Court improperly applies *Havner* to answer all three causation questions, and effectively renders *Havner* the exclusive measure of proof in all toxic tort cases. This ignores our affirmation that a plaintiff is always free to prove his case by "direct, scientifically reliable proof of causation." *Havner,* 953 S.W.2d at 715. By disregarding this avenue of proof, the Court turns substantial-factor causation on its head, requiring a toxic tort plaintiff to prove that exposure to a particular defendant's product was, by itself, the cause of his injury. Because this contravenes well-established principles of tort law, I disagree with the Court's opinion.

## A. Causation Under *Havner*

*Havner* was decided in the context of the extensive litigation surrounding the manufacture of Bendectin, a prescription medication that was marketed and sold in the United States and abroad for the treatment of nausea during pregnancy. *Id.* at 708. In that case, we considered whether the plaintiff had adduced evidence sufficient to support a jury verdict that the plaintiff's ingestion of Bendectin had caused her daughter's birth defects. *Id.* In our analysis, we distinguished between general and specific causation. *Id.* at 714. While these labels are flexible, in the context of a toxic tort case they correspond to causation questions (1) and (2). *See id.; see also* Bernstein, 74 BROOK. L.REV. at 52. We explained, "[g]eneral causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Havner,* 953 S.W.2d at 714.

As the Court acknowledges today, the principal dispute in *Havner* concerned general causation, that is, whether scientists had determined that a pregnant woman's ingestion of Bendectin could cause birth defects in her child. *Id.* at 708. Our opinion noted that more than thirty studies had been conducted in an effort to resolve that question, and that experts had not arrived at a consensus. *Id.* However, because we recognized the proof problems associated with toxic torts, we held that "[i]n the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury." *Id.* at 715. More specifically, we held that when epidemiological studies show that the risk of injury in a population exposed to a certain dose of a particular toxin is more than double the

risk of injury in a population not exposed to the toxin, those studies satisfy the demands of question (1), general causation. *Id.* at 718.

With respect to question (2), specific causation, we held that "a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk." *Id.* at 720. The claimant must also show "that he or she is similar to those in the studies." *Id.* This demonstration includes among other considerations "proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study." *Id.*

*Havner* did not address causation question (3), which considers whether, when multiple sources contribute to a plaintiff's exposure, the plaintiff's exposure to the defendant's product was a substantial factor in causing his injury. This stands to reason because, in that case, the plaintiff had only been exposed to Bendectin from one source. *Id.* at 708. For that reason, proof that the plaintiff's daughter's birth defects had been caused by Bendectin was equivalent to proof that her birth defects had been caused by Merrell Dow. The facts did not require us to consider whether the plaintiff's exposure to the defendant's product was substantial; there were no other sources of exposure. The framework we approved in *Havner*, then, did not contemplate a factual scenario involving multiple manufacturers. As a result, that alternative measure of proof should only be used to resolve causation questions (1) and (2).

## B. The Court's Application of *Havner*

Rather than recognize the fundamental differences between *Havner* and the case at bar, the Court applies a version of our *Havner* framework to causation questions (1), (2), and (3). There are three problems with the Court's approach. First, though I agree that in the absence of direct, scientifically reliable proof of causation *Havner* may be applied to resolve causation questions (1) and (2), the Court's opinion today suggests that *Havner* is the exclusive measure of proof with respect to those questions in every toxic tort case. We spoke plainly in *Havner* when we stated that proof of causation by epidemiological studies is an *alternative measure:* a plaintiff may always establish general and specific causation by "direct, scientifically reliable proof" as the Bostics did here. *Id.* at 715. Under the Court's formulation, however, a mesothelioma plaintiff with intermittent exposure is unable to recover even when he has been exposed to the products of only one manufacturer of asbestos. This is because, with respect to plaintiffs with intermittent exposure, the Court has been made aware of no epidemiological study that has established the threshold of exposure over which the risk of developing mesothelioma is doubled.

Second, the Court mistakes testimony that Timothy was exposed to "significant" levels of asbestos as dose-related evidence that might only be relevant to the epidemiological approach outlined in *Havner*. Because the Bostics were unable to produce an epidemiological study establishing a threshold of exposure over which risk is doubled for individuals who are exposed only intermittently, the Court dismisses as insufficient the evidence of Timothy's exposure to asbestos. However, evidence of the approximate quantum of fibers Timothy ingested is also relevant to plaintiffs who opt to prove causation by direct, sci-

entifically reliable evidence. Imagine a negligence case in which a plaintiff attempts to prove that her son's death was caused by his ingestion of a certain medication. And assume there is no debate among scientists that this medication is fatal to some children when ingested in sufficient doses. If the plaintiff proves general causation with reliable scientific evidence that approximately 400 milligrams of the medication can cause death in children, the plaintiff will be able to prove specific causation in at least two ways. First, she may produce an autopsy report showing that the child's body contained approximately 400 milligrams of the medication at the time of his death. Second, she may demonstrate, perhaps by the testimony of an observer, that the child swallowed approximately 400 milligrams of the medication an hour before he died. In this way, plaintiffs may employ evidence of approximate dose to prove causation by direct, scientifically reliable evidence. In other words, the dose-related evidence proves that the child ingested a sufficient quantity of medication to actually cause his injury, not that the child ingested a sufficient quantity to more than double his risk of dying.

The same is true in this case. Though the Bostics did not produce an autopsy demonstrating the concentration of asbestos fibers in Timothy's lungs, they did produce the testimony of reliable expert witnesses who stated that Timothy's ingestion of asbestos exceeded the level over which that toxic substance can cause mesothelioma. When the Court is confronted with this evidence, it only considers its probative value in relation to the method of proof by epidemiological study we explained in *Havner*. But the Court also should have considered whether the Bostics proved their case in the traditional way, by "direct, scientifically reliable proof of causation." *Havner*, 953 S.W.2d at 715.

As I demonstrate in the forthcoming sections, the Bostics accomplished this task.

Finally, and most problematically, the Court implements *Havner* to resolve causation question (3). This makes little sense in light of the fact that *Havner* contemplated the degree of increased risk a plaintiff must demonstrate in order to prove that a certain toxin caused her injury in the absence of direct proof. *Id.* But causation question (3) has nothing whatsoever to do with whether a toxin caused a plaintiff's injury: that inquiry is resolved by causation questions (1) and (2). Rather, causation question (3) contemplates whether the actions of a specific defendant were significant enough to be denominated a substantial factor in bringing about the plaintiff's disease. *See* Bernstein, 74 BROOK. L. REV. at 55. The first two questions contemplate risk, and resort to *Havner* is appropriate. The third question contemplates substantiality, and *Havner* has no place.

In order to apply that case's framework to a causation question that was not presented by its facts, the Court must alter the standard in a subtle, but significant way. According to the Court, multiple-exposure toxic tort plaintiffs must now produce "scientifically reliable proof that the plaintiff's exposure to the *defendant's* product more than doubled his risk of contracting the disease." *Ante* at 350 (emphasis added). This is a marked departure from our precedent. The Court now holds that in multiple-exposure cases a plaintiff must isolate his exposure to each defendant's product and show that exposure to that particular defendant's product, alone, more than doubled his risk. This transforms a substantial-factor inquiry into a singular-factor inquiry. Rather than require a plaintiff to prove that exposure to each defendant's product was, relative to his exposure from other sources, a sub-

stantial factor in causing his mesothelioma, the Court now requires the plaintiff to prove that exposure to each defendant's product was sufficient by itself to cause his mesothelioma. It is a foundation of tort law, and of substantial-factor causation in particular, that the actions of multiple defendants may converge to cause a plaintiff's harm. *Atchison v. Tex. & Pac. Ry. Co.*, 143 Tex. 466, 186 S.W.2d 228, 231 (1945); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992). These causes may be independently sufficient to cause the plaintiff's harm, or independently insufficient to cause the plaintiff's harm. In either instance, our precedent makes plain that a defendant may not escape liability simply because his tortious acts were accompanied by the tortious acts of others. *See, e.g., Atchison*, 186 S.W.2d at 231 ("[I]f an injury occurs from two causes, both due to the negligence of different persons, but together constituting an efficient cause, all persons whose acts contribute to the injury are liable therefor, and the negligence of one does not excuse the negligence of the other."). In today's case, the Court affirms that substantial-factor causation governs in the context of toxic torts, but, at the same time, requires plaintiffs to isolate the exposure to each defendant's product and prove that exposure to that defendant's product alone was sufficient to cause the plaintiff's disease. I affirm that tort law requires a plaintiff to show that each defendant's product caused his injury, but I do not agree that in a multiple-exposure case a plaintiff must show that a single defendant's product was sufficient by itself to cause his disease. We have never required plaintiffs to meet this arbitrary standard of proof, and we should not do so today.

This extension of *Havner* not only imposes an illogical burden on plaintiffs, but also departs from *Flores*, in which we first approved substantial-factor causation in the multiple-exposure toxic tort context. After today, the law in these types of cases will be that exposure to a single defendant's product is a "substantial factor" in bringing about a plaintiff's injury only when that exposure would have been sufficient, by itself, to more than double the plaintiff's risk of developing a particular disease. But imagine a case in which a plaintiff demonstrates that she has been exposed to a certain toxin, from two different sources, that was certainly the cause of her disease. In other words, the plaintiff proves causation questions (1) and (2), but question (3) remains disputed. Now also imagine that the plaintiff's expert witness testifies that the plaintiff's exposure to Company A's toxin is 75% responsible for her illness, while the plaintiff's exposure to Company B's toxin is 25% responsible for her illness. However, on cross-examination, the expert admits that neither exposure, by itself, would more than double the plaintiff's risk of developing the disease. He also concludes that the plaintiff's illness is not overdetermined. Under the paradigm the Court urges, a jury would not be entitled to conclude that the plaintiff's exposure to the toxin produced by Company A was a substantial factor in bringing about her injury, even though the plaintiff's expert testified that it bore 75% of the responsibility for causing that injury, because the plaintiff's exposure to that toxin was not sufficient, by itself, to cause the plaintiff's illness.

This is in stark contrast to the position taken by the Restatement with respect to substantial-factor causation. In explaining its stance, the Restatement envisions a car, owned by Paul, parked at a scenic overlook. RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 27 cmt. f, illus. 3 (2010). It then suggests that Able, Baker, and Charlie negligently lean against the car, which results in the vehicle's "plummeting

down the mountain to its destruction." *Id.* The commentators add that the force exerted by any one of the three men "would have been insufficient to propel Paul's car past the curbstone, but the combined force of any two of them is sufficient." *Id.* Under these circumstances, the Restatement concludes that each of the three men is a factual cause of the destruction of Paul's car. *Id.* This is true even though the force exerted by each of the men was independently insufficient to destroy the vehicle. *Id.* In today's opinion, the Court moves in the opposite direction by holding that unless a plaintiff's exposure to a particular defendant's product was sufficient by itself to more than double the plaintiff's risk of sustaining an injury, it cannot be a substantial factor in bringing that injury about. This holding does not just offend logic—it offends justice, and it misconstrues *Flores* to do so.

### C. The Court's Analysis of the "Any Exposure" Theory

In an attempt to justify its graft of a modified version of the test we developed in *Havner* onto the model of substantial-factor causation *Flores* approved, the Court criticizes what it perceives to be its only alternative. Specifically, the Court enumerates the many shortcomings of the "any exposure" theory of causation, which would permit a plaintiff to prove causation by showing any exposure to a defendant's product. The puzzling aspect of the Court's insistence that we should not adopt this position is that no one urges the Court to do so. At oral argument, the Bostics' attorney stated: "I want to be very clear ... because Georgia–Pacific has stated repeatedly that we're after the[ ] any exposure test or [argue that] a single fiber can cause [mesothelioma]. That is not the standard that *Borg–Warner* adopted nor is it the standard we're proposing." So far as I can tell, this misunderstanding has arisen from a misreading of the expert testimony. At trial, several expert witnesses stated that every exposure to asbestos contributes to the causation of mesothelioma insofar as an increased quantity of asbestos concentrated in the lungs heightens a person's risk of developing the disease. Dr. Brody, for example, affirmed that "each and every exposure that a person has to asbestos contributes to their risk for developing disease." The doctor then clarified, "What that means is every time a person is exposed ... some proportion of those fibers will concentrate in the lung and some of those fibers will reach that site where the disease develops. There's no way to exclude any of them. ... So everything the person's exposed to is contributing and making it more likely that the person gets disease." Other experts provided similar explanations. I agree with the Court that evidence that the plaintiff was exposed to any quantity of the defendant's asbestos, without more, is insufficient by itself to prove the causal link between a particular defendant's product and the plaintiff's injury. But this is not a controversial stance—no one argues that it should.

Still, the Court attempts to bolster its position by arguing that "[i]f any exposure at all were sufficient to cause mesothelioma, everyone would suffer from it or at least be at risk of contracting the disease." *Ante* at 339. This statement misunderstands the expert testimony regarding the nature of mesothelioma. As the expert witnesses testified at trial, mesothelioma is caused by asbestos fibers that migrate through the lung and cause genetic errors in mesothelial cells. When the exposure is only at background levels, "we tend to keep up and it's not a problem. As you start being exposed ... in other settings where it's above background, then it's more difficult." And even when a person's

exposure exceeds background levels, that exposure is not sufficient to cause the disease without additional misfortune. Fate must frown upon a person in more than one respect before he develops this rare form of cancer. As Dr. Brody explained at trial, a cell must accumulate a sufficient number of genetic errors of precisely the right kind before it becomes cancerous. This accumulation depends on at least two factors that are governed by chance. First, the accumulation of asbestos fibers in the pleura occurs unpredictably, and depends on a macrophage or other cell picking up the fiber and transporting it into the fluid flow of the lung. Second, this accumulation is subject to a host of individual genetic factors that affect a person's susceptibility to mesothelioma. Because these genetic factors vary from individual to individual, no person's risk of developing mesothelioma is the same as another's. To state that any exposure to asbestos is not sufficient to cause mesothelioma, simply because every person has not developed mesothelioma, is to ignore the testimony of the expert witnesses at trial and to misunderstand fundamentally the nature of the disease.

## D. The Concurrence Forecloses Proof by Direct Evidence

Though both the Court and the concurrence disregard scientific consensus that very low levels of exposure to asbestos cause mesothelioma, the concurrence does so in a way that forecloses the avenue of "direct, scientifically reliable proof of causation" that our opinion in *Havner* preserved. 953 S.W.2d at 715. The concurrence states that the Bostics were required to resort to proof by epidemiological studies because they were unable to "tie a specific manufacturer's asbestos fiber to

[Timothy's] ailment." *Ante* at 366. This statement is troubling for two reasons. For one, it reveals that the concurrence shares the Court's misunderstanding of the nature of mesothelioma. The expert testimony at trial flatly forecloses the notion that a single asbestos fiber could generate a sufficient number of genetic errors in a cell to cause a person to develop that disease. More problematically, however, the concurrence's statement suggests that a plaintiff must identify the particular fibers that contributed to the development of his mesothelioma should he opt to prove causation by direct, scientifically reliable evidence. This replaces substantial-factor causation with the equivalent of but-for causation, insofar as it requires a plaintiff to identify the fibers without which he would not have developed mesothelioma. Taken at its word, the concurrence obligates a plaintiff to chart the progress of his disease on a molecular level as it actually occurred. This would amount to conclusive evidence of a defendant's liability. In this manner, the concurrence advocates that the standard of proof be altered.

The concurrence also insists that the Bostics' evidence with respect to Timothy's exposure lacked specificity. As I recount in further detail in the next part, Dr. Longo concluded that Timothy was exposed to chrysotile asbestos in "significant" quantities, that is, at levels ten to twenty times the average background level. In light of the fact that exposure to very low levels of asbestos can cause mesothelioma, that Timothy did develop the disease, and that asbestos is the only known environmental cause of mesothelioma, I fail to see how the evidence the Bostics adduced was inadequate to prove causation by a preponderance of the evidence.[1] For those reasons,

---

1. Whether a plaintiff relies on traditional science or the alternative measure of proof announced in *Havner,* she must prove her case by a preponderance of the evidence. *Havner,*

I cannot agree with the position the concurrence urges.

### III. Application

Having outlined the available avenues by which a plaintiff may prove causation in a toxic tort case, I turn to the facts at hand. I consider whether the Bostics have proven (1) that asbestos has the capacity to cause mesothelioma, and in what quantity, (2) that asbestos caused Timothy's mesothelioma, and (3) that Timothy's exposure to asbestos from Georgia–Pacific's product was a substantial factor in causing his mesothelioma. As I determine whether there is more than a scintilla of evidence to support the jury's findings, I consider "whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." *Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 638 (Tex.2009). This examination, which hinges on the reliability of expert testimony, encompasses the entire record. *Id.*

### A. General Causation

In toxic tort cases, we have indicated that general causation may be proved in two ways. Under *Havner,* a plaintiff may produce epidemiological studies that establish a threshold of exposure to a toxin over which a person's risk of sustaining injury is more than doubled. 953 S.W.2d at 715–18. From this evidence, jurors may infer that the toxin probably causes the injury in persons who are exposed to quantities at or above the threshold. *Id.* at 715. However, *Havner* has never been the exclusive measure of proof. *Id.* The plaintiff is always free to establish causation in the traditional way, by "direct, scientifically reliable proof." *Id.*

In the case at bar, multiple expert witnesses testified that chrysotile asbestos, which is the kind of asbestos Georgia–Pacific included in its products, causes mesothelioma. Dr. Lemen detailed the history of scientific research with respect to this important question, and concluded that the research supported an opinion that mesothelioma is caused by this type of asbestos, even when a person is exposed to only very low doses of the toxin. Dr. Hammar agreed and noted that the National Institute for Occupational Safety and Health, the Environmental Protection Agency, the American Industrial Hygiene Association, the International Agency for Research on Cancer, and the World Health Organization all affirm that chrysotile asbestos causes mesothelioma. As I recounted in Part I, Dr. Brody detailed the biological process by which asbestos fibers migrate through the lung, into the pleura, and cause genetic errors in mesothelial cells. He affirmed that chrysotile fibers were capable of causing these errors, even in very small quantities. This evidence is compelling. Taken together, it would have enabled reasonable jurors to conclude that asbestos from Georgia–Pacific's products can cause mesothelioma.

### B. Specific Causation

As with general causation, there are two methods by which a plaintiff may prove specific causation. Pursuant to *Havner,* a plaintiff may produce evidence that he was exposed to a dose of the toxin that brings him in line with epidemiological studies showing that his risk of injury was more than doubled. 953 S.W.2d at 720. As noted above, "[t]his would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was

953 S.W.2d at 728. Obviously, this writing affirms that standard.

consistent with that experienced by those in the study." *Id.* If other plausible causes of the injury can be negated, the plaintiff must negate those causes with reasonable certainty. *Id.* However, once again, the plaintiff may prove specific causation in the traditional way, by "direct, scientifically reliable proof." *Id.* at 715.

In the case at bar, Dr. Hammar testified that chrysotile asbestos caused Timothy's mesothelioma. Dr. Hammar based his opinion on his own experience. TEX. R. EVID. 702. He explained that he had "personally diagnosed cases of mesothelioma in individuals with low exposures to chrysotile asbestos." In considering Timothy's level of exposure, Dr. Hammar reviewed Timothy's pathology materials, medical records, and work history. Dr. Hammar then testified that he had concluded that Timothy was "exposed at high enough levels ... in doing this drywall work, in mixing[,] sanding[,] and cleaning up of drywall materials" that asbestos exposure was, to a reasonable medical certainty, the cause of his mesothelioma. Dr. Longo affirmed this conclusion by testifying that Timothy had been exposed to chrysotile asbestos in "significant" quantities, that is, at levels ten to twenty times the average background level. This exposure is greater than the very low levels of exposure sufficient to cause mesothelioma. Dr. Longo based his conclusion on Timothy's and Harold's testimony, as well as experiments he had conducted to determine how much asbestos is released during the installation of drywall.

The testimony of Drs. Hammar and Longo was in keeping with the testimony of Dr. Lemen, who explained that individuals who work with joint compound are susceptible to mesothelioma. Dr. Lemen clarified that his conclusion was not limited to those with occupational exposure. He explained that his opinion was based on a study conducted by Dr. Selikoff, who found mesothelioma in drywallers who had "three months or less of exposure to asbestos." Dr. Lemen also testified that if a patient has a history of asbestos exposure above background levels, and no history of therapeutic radiation, then the "accepted" cause of his mesothelioma is asbestos. *See also* 3 DAVID L. FAIGMAN ET AL., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY § 26:24 (2013–14) ("It is generally accepted that any pulmonary asbestos concentration that is substantially above background is an indication of causation."). Taken together, the testimony of these expert witnesses would have enabled reasonable jurors to conclude that exposure to chrysotile asbestos caused Timothy Bostic's mesothelioma.

## C. Substantial–Factor Causation

This final inquiry required the Bostics to show that Timothy's exposure to Georgia–Pacific's chrysotile asbestos was a substantial factor in causing his mesothelioma. As I explained in Part II, *Havner* may not be applied to resolve this question.

In *Flores*, we explained that "[t]he word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." 232 S.W.3d at 770 (citation and internal quotation marks omitted). We clarified further that a plaintiff may satisfy the dictates of substantial-factor causation " 'by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggre-

gate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer.'" *Id.* at 773 (quoting *Rutherford v. Owens–Illinois, Inc.,* 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203, 1219 (1997)). This relieves plaintiffs of an impossible burden: proving "that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." *Id.* (citation and internal quotation marks omitted). Still, we maintained that a plaintiff must produce "[d]efendant-specific evidence relating to the approximate dose to which the plaintiff was exposed," though with the caveat that the dose "need not be reduced to mathematical precision." *Id.*

For this reason, plaintiffs are not required to calculate dose in absolute terms. When it comes to the question of whether a plaintiff's exposure to a defendant's product in a multiple-exposure case was substantial, the *relevant* quantification is *relative* quantification: a plaintiff can prove causation by showing that her exposure to a certain defendant's product was sufficiently significant, in relative terms, that it should be considered a substantial factor in causing his injury. This is not the first time we have indicated that this consideration might be important. In *Flores,* we held that the plaintiff had failed to quantify his exposure to the defendant's product with sufficient particularity in part because this lack of evidence made us unable to determine whether that exposure "sufficiently contributed to the aggregate dose of asbestos Flores inhaled, such that it could be considered a substantial factor in causing his asbestosis." *Id.* at 772.

As the Court notes, consideration of a plaintiff's aggregate dose is in keeping with all three volumes of the Restatement of Torts. Both the first and second volumes recognize that an important consideration in determining whether a factor is so causative as to be considered substantial is "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it." Restatement (Second) of Torts § 433(a) (1965); Restatement (First) of Torts § 433(a) (1934). The third volume advises that "[w]hen an actor's negligent conduct constitutes only a trivial contribution to a causal set that is a factual cause of harm ... the harm is not within the scope of the actor's liability." Restatement (Third) of Torts: Phys. & Emot. Harm § 36 (2010).

In multiple-exposure cases, once a plaintiff proves causation questions (1) and (2), the only question that remains is whether the plaintiff's exposure to a defendant's product was substantial enough to be regarded as a cause "in the popular sense, in which there always lurks the idea of responsibility." *Flores,* 232 S.W.3d at 770. A jury is well-suited to make this determination. As the Court admits, "some discretion must be ceded to the trier of fact in determining whether the plaintiff met that standard. One respected treatise has opined that it is 'neither possible nor desirable to reduce [substantial factor] to any lower terms.'" *Ante* at 347 (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 41 (5th ed.1984)). As part of this determination, jurors may consider whether the plaintiff proved that a certain defendant's product was independently sufficient to cause his illness, either by resort to *Havner* or by "direct, scientifically reliable proof." *Havner,* 953 S.W.2d at 715. Jurors should consider this as one factor among many, as it may be more fitting to denominate an exposure substantial when it is independently sufficient to cause the plaintiff's disease. However, in contrast to the Court, I maintain that this consideration is relevant, rather than prerequisite.

In the case at bar, the Bostics produced evidence that Timothy Bostic was exposed to asbestos from three primary sources: First, Timothy ingested Georgia–Pacific's joint compound, which he and his father used "98 percent of the time" while completing residential construction projects. Timothy was also exposed to asbestos at the Knox Glass plant, which may have been produced by any number of manufacturers. Finally, while employed by Palestine Contractors Timothy inhaled particles from the asbestos used to insulate pipes, which again may have been produced by any number of manufacturers.

The Bostics also produced evidence as to the approximate quantum of time Timothy was exposed to each source of asbestos: Timothy worked with his father throughout his childhood on residential construction projects. When he was only a boy, Timothy mixed dry joint compound, sanded it on the walls "[a]s far up as he could reach," and swept the dust generated by sanding. Expert witnesses consistently maintained that exposure to asbestos during childhood can be particularly detrimental. Timothy also worked at the Knox Glass plant for three summers, where his ingestion of asbestos may have been more severe in one part of the plant than in another. In addition, Timothy was exposed to fibers that his father carried home on his clothing from the plant. Because Timothy did not live with Harold full-time, this exposure was sporadic. Finally, Timothy worked at Palestine Contractors for two summers, where he encountered asbestos on an intermittent basis.

The Bostics also produced evidence that Timothy's exposure to Georgia–Pacific's products was independently sufficient to cause his mesothelioma. Dr. Hammar testified that Timothy was exposed to sufficiently high levels of asbestos that his

exposure was, to a reasonable medical certainty, the cause of his mesothelioma. Dr. Longo agreed, testifying that Timothy had been exposed to Georgia–Pacific's asbestos at levels ten to twenty times the average background levels. This exposure is greater than the very low levels of exposure sufficient to cause mesothelioma.

And though the evidence the Bostics put forward with respect to Timothy's exposure is hardly exact, we do not require a plaintiff to reduce the quantity of exposure "to mathematical precision." *Flores*, 232 S.W.3d at 773. I would hold that the evidence the Bostics presented in this case was sufficiently specific to enable a jury to determine that Timothy's exposure to Georgia–Pacific's asbestos was a substantial factor in causing his illness.

## IV. Conclusion

By requiring every plaintiff to produce epidemiological studies demonstrating that exposure to every defendant's product independently more than doubled his risk of developing a disease, the Court renders *Havner* a hindrance rather than a help. In this case, the Bostics produced scientifically reliable evidence that asbestos causes mesothelioma, that it caused Timothy's development of that disease, and that Timothy's exposure to Georgia–Pacific's asbestos-containing products was substantial in relation to his exposure to other asbestos sources. Because they adduced this evidence in the traditional way, they had no need to resort to the alternative measure we approved in *Havner*. By elevating this standard to the exclusive measure of proof, the Court effectively forecloses recovery for mesothelioma plaintiffs with intermittent exposure to asbestos until researchers develop epidemiological studies demonstrating a doubling of the risk in that population. The Court also forecloses recovery for mesothelioma

plaintiffs who were exposed to multiple sources of asbestos when no single source of exposure is sufficient, by itself, to more than double that plaintiff's risk of developing mesothelioma. Under the paradigm the Court propounds, this would remain true even in the face of reliable expert testimony that the plaintiff's mesothelioma was overwhelmingly attributable to one source. For these reasons, and because in this instance I would hold that the Bostics proved that exposure to Georgia–Pacific's asbestos-containing product was a substantial factor in causing Timothy's injury, I would reverse the judgment of the court of appeals and reinstate the trial court's judgment in favor of the Bostics.